(748 P.2d 430)

No. 60,432

HAROLD L. THOMPSON, deceased, and RICHARD E. SHREVE, *Claimants-Appellees*, v. HAROLD THOMPSON TRUCKING, *Respondent-Appellee*, KANSAS FIRE AND CASUALTY COMPANY, *Insurance Carrier-Appellant*, and MURFIN DRILLING COMPANY and RELIANCE INSURANCE COMPANY, *Respondent and Insurance Carrier-Appellees*.

Petition for review denied March 4, 1988.

Opinion
filed December 31, 1987.

*Ronald J. Laskowski* and *Larry G. Pepperdine*, of Fisher, Patterson, Sayler & Smith, of Topeka, for the appellant.

*Robert L. Constable*, of Salina, for the appellees, Harold L. Thompson, deceased, and Harold Thompson Trucking.

*Randall W. Weller*, of Jones and Weller, P.A., of Hill City, for the appellee, Richard E. Shreve.

*Gary A. Winfrey* and *Don D. Gribble, II*, of Kahrs, Nelson, Fanning, Hite and Kellogg, of Wichita, for the appellees, Murfin Drilling Company and Reliance Insurance Company.

Before BRISCOE, P.J., ROBERT L. GERNON, District Judge, assigned, and THOMAS W. REGAN, District Judge, assigned.

BRISCOE, J.: This is a workers' compensation proceeding in which four actions have been consolidated. Richard E. Shreve and Mina Thompson, the wife of decedent Harold L. Thompson, brought claims against Harold Thompson Trucking and Kansas Fire and Casualty (its insurer), and against Murfin Drilling Company and Reliance Insurance Company (its insurer), for injuries arising out of an oil tank explosion and fire. Kansas Fire appeals the district court's decisions in favor of the claimants.

Harold L. Thompson, doing business as Harold Thompson Trucking, was engaged in hauling salt water, fresh water, and crude oil to and from oil field operations. Thompson Trucking employed three persons, including Richard E. Shreve, who had worked for Thompson Trucking for six to eight weeks before the accident.

On September 14, 1981, Thompson and Shreve were cleaning an oil tank on a lease operated by Murfin. Murfin had contracted with Thompson Trucking to clean the oil tank. During the course of cleaning, an explosion and fire occurred, resulting in severe burns to both Shreve and Thompson. Thompson died as a result of the accident.

Both Shreve and Mina Thompson brought workers' compensation claims against Thompson Trucking and Kansas Fire and against Murfin and Reliance for injuries arising out of the accident. The ALJ found that Shreve suffered a 90 percent permanent partial disability to the body as a whole. The ALJ further

found Shreve was a statutory employee of Murfin and entered an award in favor of Shreve and against Murfin and Reliance. The ALJ found that Thompson was not a statutory employee of Murfin but was covered by Thompson Trucking's policy with Kansas Fire and entered an award in favor of Thompson and against Thompson Trucking and Kansas Fire. The Director affirmed the award to Thompson but modified the award to Shreve, entering an order in favor of Shreve and against Thompson Trucking and Kansas Fire, rather than Murfin. The district court adopted the findings and conclusions of the Director.

## I. COVERAGE UNDER KANSAS FIRE POLICY.

Kansas Fire contends the district court erred in finding the insurance policy issued by Kansas Fire covered Thompson Trucking's tank cleaning business.

On September 14, 1981, the date of the accident, Kansas Fire provided workers' compensation insurance to Thompson Trucking. Paragraph I of the policy reads as follows:

"Coverage A—Workmen's Compensation: To pay promptly when due all compensation and other benefits required of the insured by the workmen's compensation law."

The policy was obtained through an independent insurance agent. On the original application for coverage with Kansas Fire in 1979, the description of Thompson Trucking's business was: "Insured provides a driver & diesel mechanic to Mobil pipeline for the purpose of transporting crude oil from tank batteries in the area to the pipeline entrances and dumping the oil into the line." At all times subsequent to the original application, the classification assigned to the employees of Thompson Trucking and shown on the declarations page attached to the policy was "Truckmen." There is a special insurance classification for "tank cleaning," and, according to the insurance agent who handled the Thompson Trucking account, Kansas Fire does not insure against this risk.

During the preliminary hearing, Mina testified that she and Thompson asked the insurance agent if their employees would be covered by their workers' compensation insurance if Thompson Trucking added a water hauling truck. During her deposition, however, she testified she asked the agent whether the

trucking company would be covered if any changes were made in the business. She testified the agent told them there would not be any problem with coverage for changes since any additional premium or charges would be taken care of at the time of renewal or audit.

When the policy was renewed in September 1980, Thompson Trucking was only engaged in transporting crude oil. During an audit by the insurance company in January 1981, the only business of Thompson Trucking was transportation of crude oil.

The central issue presented in this case is one of first impression in Kansas. We are asked to determine whether the declarations page, specifically the classification of operations appearing on the declarations page, limits the scope of coverage in a workers' compensation insurance contract. Kansas Fire argues it was never the intent of Kansas Fire to insure a tank cleaning operation. Murfin and Reliance counter by arguing the classification of operations does not determine what operations are in fact covered under the policy. Murfin and Reliance contend the classification of operations is used only by the insurance company to determine premium rates.

We begin our analysis by first reviewing the general rules for construction of insurance policies as stated in *American Media, Inc. v. Home Indemnity Co.*, 232 Kan. 737, 739-40, 658 P.2d 1015 (1983):

" ' "In construing an insurance policy a court should consider the instrument as a whole and endeavor to ascertain the intention of the parties from the language used, taking into account the situation of the parties, the nature of the subject matter and the purpose to be accomplished. . . .

" ' "Policies must be construed according to the sense and meaning of the terms used, and if the language is clear and unambiguous, it must be taken in its plain, ordinary and popular sense . . . ." [Citation omitted.]

" ' ". . . As a general rule, the construction and effect of a written contract of insurance is a matter of law to be determined by the court. If the facts are admitted, . . . then it is for the court to decide whether they come within the terms of the policy. . . ." [Citation omitted.]

" ' "The language of a policy of insurance, like any other contract, must, if possible, be construed in such manner as to give effect to the intention of the parties. Where the terms of a policy of insurance are ambiguous or uncertain, conflicting or susceptible of more than one construction, the construction most favorable to the insured must prevail. Since the insurer prepares its own contracts, it has a duty to make the meaning clear. If the insurer intends to restrict or

limit coverage provided in the policy, it must use clear and unambiguous language in doing so; otherwise, the policy will be liberally construed in favor of the insured. If, however, the contract is clear and unambiguous, the words are to be taken and understood in their plain, ordinary and popular sense, and there is no need for judicial interpretation or the application of rules of liberal construction; the court's function is to enforce the contract according to its terms. . . ." [Citation omitted.]

" ' "When an insurance contract is not ambiguous, the court may not make another contract for the parties. Its function is to enforce the contract as made. . . . To be ambiguous the contract must contain provisions or language of doubtful or conflicting meaning, as gleaned from a natural and reasonable interpretation of its language. . . . Ambiguity in a written contract does not appear until the application of pertinent rules of interpretation to the face of the instrument leaves it genuinely uncertain which one of two or more meanings is the proper meaning. (Citing cases.)" [Citation omitted.]

" ' " ' . . . [W]here a contract is unambiguous it must be enforced according to its terms. . . .' " [Citation omitted.]' "

Unless specifically included by reference, the declarations page to an insurance contract is not an actual part of the contract. 1 Couch on Insurance 2d § 3:24 (1984) provides:

"Statements as to the nature of the coverage, appearing in bold black type on the back and top of the page of the policy immediately preceding the contract proper, may be considered as representing the construction placed upon the contract by the insurer itself even though they are not considered a part of the contract."

Although the term "declarations page" is not used, the description is that of a declarations page.

"An insurance contract may thus consist of several separate documents. But statements in a collateral document do not become a part of the contract of insurance unless they are so referred to therein as clearly to indicate that the parties intended to make them a part of such contract. In the absence of such clear reference, the rights and liabilities of the parties to a contract of insurance are to be determined by the terms of the policy itself, to the exclusion of other papers not made a part thereof." 1 Couch on Insurance 2d § 3:24.

In the present case, however, the caption and first line of the insurance policy states that Kansas Fire:

"[a]grees with the insured, named in the declarations made a part hereof, in consideration of the payment of the premium and in reliance upon the statements in the declarations and subject to the limits of liability, exclusions, conditions and other terms of this policy."

Arguably, this language incorporates by reference the declarations recorded on the face sheet attached to the policy and,

therefore, makes them a part of the insurance contract in this case.

We next must determine whether the classification of operations appearing on the declarations page limits the scope of coverage under this workers' compensation insurance contract.

"Whether an employee is covered by a compensation policy is determined by the statutes of the state, the terms of the policy, and the general nature of his employment; and an employee entitled to coverage under the statutes should not be excluded from the coverage of a policy unless the exclusion is plain and unambiguous. *The coverage of the policy is not restricted by the classifications of employees contained therein*; and the fact that plaintiff's employment does not fall within the 'Classification of Operations' contained in the policy is not material in determining whether he is covered thereby." 100 C.J.S., Workmen's Compensation § 372, p. 88. Emphasis added.

In *Black v. Swetnick*, 281 App. Div. 997, 120 N.Y.S.2d 663 (1953), the court ruled that a policy covering "building employees, clerical employees and 'all other employees'" included nurses. The court stated: "[T]he coverage of the policy is not restricted by the classifications; they are relevant only for the purpose of computing the premium." 281 App. Div. at 998. See *DeBonis v. Chuckrow*, 2 App. Div. 2d 938, 939, 156 N.Y.S.2d 641 (1956).

A Texas court has held similarly in a case involving an ultrahazardous activity. In *Maryland Cas. Co. v. Sullivan*, 160 Tex. 592, 334 S.W.2d 783 (1960), the employer's operation was classified as "seed merchant" although the company was engaged in both the sale and application of fertilizers and chemicals. The claimant was killed while applying insecticides by airplane. The policy provided "that if the employer engaged in other business operations than those described in the Declaration, together with all operations necessary, incident or appurtenant thereto, such declared business operation, or connected therewith, whether conducted at such work places or elsewhere, and such latter operations are not described or rated in the Declaration, then the employer shall pay the premium on such other operations." 160 Tex. at 598. Nevertheless, the court held that risk of flying the airplane was not excluded by the terms of the policy.

Kansas Fire's policy does refer to the classification of operations and premium amounts on the first page of the three-page policy in the following paragraph:

"1. Premium: The premium bases and rates for the classifications of operations described in the declarations are as stated therein and for classifications not so described are those applicable in accordance with the manuals in use by the company."

However, nowhere in the policy is there a direct statement that the purpose of the classification of operations is to determine the premium, nor is there a direct statement that the classification of operations is determinative of coverage. We do note that immediately under the column entitled "CLASSIFICATION OF OPERATIONS" on the declarations page, the following language appears: "Entries in this item, except as specifically provided elsewhere in this policy, do not modify any of the other provisions of this policy." Following this statement, the word "Truckmen" appears as the delineated classification of operations for the insured, Thompson Trucking.

We have found no Kansas case which holds that the classification of operations is relevant only for the purpose of computing the premium. However, as Murfin argues, coverage does not depend on our reaching that conclusion if the policy provision concerning workers' compensation coverage can be broadly interpreted to conflict with any limitations on the scope of coverage provided by the classification of operations.

Under the rules of construction of contracts, an ambiguity is said to exist if the words used in the contract may be understood to reach two or more possible meanings. *Girrens v. Farm Bureau Mut. Ins. Co.*, 238 Kan. 670, 675, 715 P.2d 389 (1986); *Western Casualty & Surety Co. v. Budig*, 213 Kan. 517, 519, 516 P.2d 939 (1973). In this case, any limitation on the scope of coverage by the listed classification of operations of "truckmen" can be broadly interpreted to conflict with Coverage A, which provides: "To pay promptly when due all compensation and other benefits required of the insured by the workmen's compensation law." Where an insurance contract is open to different constructions, that most favorable to the insured must be adopted. *Girrens*, 238 Kan. at 675; *Central Security Mut. Ins. Co. v. DePinto*, 235 Kan. 331, 681 P.2d 15 (1984).

"[I]f the terms of a policy are ambiguous, obscure, or open to different constructions, the construction most favorable to the insured or other beneficiary must prevail. That general rule applies with particular force to an ambiguous or

doubtful provision in a policy or in an endorsement attached thereto which attempts to exclude from coverage liability in certain circumstances. [Citations omitted.] And as a concomitant to that rule, it is held in Kansas that if an insurer intends to restrict its coverage, it should use language clearly stating its purpose. [Citations omitted.]" *Prickett v. Hawkeye-Security Insurance Company*, 282 F.2d 294, 301 (10th Cir. 1960).

See *United States Fidelity & Guar. Co. v. Farm Bureau Mut. Ins. Co.*, 2 Kan. App. 2d 580, 584 P.2d 1264 (1978).

In the present case, we conclude that, even if the classification of operations could limit the scope of coverage in a workers' compensation insurance contract, the claimants are still covered under the policy because the classification of operations and the workers' compensation coverage provisions are conflicting or ambiguous. Furthermore, an insurance company wishing to limit the scope of coverage to that classification of operations listed in the declarations can do so by express exclusion. See *Fyne v. Industrial Acc. Com.*, 138 Cal. App. 2d 467, 477, 292 P.2d 78 (1956) (policy had specific clause excluding injuries " 'sustained by any employees engaged in any operations other than those operations specifically rated and described as covered hereunder in the Classification of Operations schedule herein' "). See *Maryland Cas. Co. v. Sullivan*, 160 Tex. 592.

Here, the policy contained paragraphs (a)-(f) under its exclusion section. In this section the policy contained exclusions of any work place or state not described in the declarations, but none excluding operations not listed on the declarations page. Therefore, we conclude the tank cleaning operation was not excluded under the workers' compensation insurance policy that Thompson Trucking had with Kansas Fire.

## II. THOMPSON AS STATUTORY EMPLOYEE OF MURFIN DRILLING

Kansas Fire contends the district court erred in finding the decedent Thompson was not a statutory employee of Murfin at the time of his accident and death, pursuant to K.S.A. 44-503(a). No issue is raised as to Shreve's status, who was determined to be a statutory employee of Murfin.

K.S.A. 44-503(a) provides in part:

"Where any person (in this section referred to as principal) undertakes to execute any work which is a part of his trade or business or which he has

contracted to perform and contracts with any other person (in this section referred to as the contractor) for the execution by or under the contractor of the whole or any part of the work undertaken by the principal, the principal shall be liable to pay to any workman employed in the execution of the work any compensation under the workmen's compensation act which he would have been liable to pay if that workman had been immediately employed by him."

As stated in *Robinson v. Flynn's Ferry Service, Inc.*, 6 Kan. App. 2d 709, 712-13, 633 P.2d 1166, *rev. denied* 230 Kan. 819 (1981), the principal purpose of 44-503(a) is:

" ' "to give to employees of a contractor who has undertaken to do work which is a part of the trade or business of the principal, such remedy against the principal as would have been available if they had been employed directly by the principal, and to prevent employers from evading liability under the act by the device of contracting with outsiders to do work which they have undertaken to do as a part of their trade or business." ' [Citations omitted.]"

In *Robinson*, this court enumerated the tests applied to determine whether work covered by a subcontract is a part of the principal contractor's trade or business under the statute:

" '(1) Is the work being performed by the independent contractor and the injured employee necessarily inherent in and an integral part of the principal's trade or business? (2) Is the work being performed by the independent contractor and the injured employee such as would ordinarily have been done by the employees of the principal? If either of the foregoing questions is answered in the affirmative the work being done is part of the principal's "trade or business" . . . .' " 6 Kan. App. 2d at 713.

In the present case, Murfin was a production company that did contract drilling for oil and gas wells. A representative testified that, although Murfin did not maintain a crew or equipment to clean tanks, such a procedure was important to Murfin's operation and, if it was not done, Murfin would be unable to produce oil. Thus, from this testimony, it appears the work done by decedent Thompson was part of Murfin's business, thereby qualifying Thompson as a statutory employee of Murfin.

(a) Self-employed contractor.

In *Allen v. Mills*, 11 Kan. App. 2d 415, Syl. ¶¶ 2, 3, 724 P.2d 143 (1986), this court found that, by K.S.A. 1985 Supp. 44-508(b), the legislature excluded from the Act a self-employed person, and that a "person cannot be a contractor and an employee of himself and thereby be a statutory employee under K.S.A. 44-503(a)."

K.S.A. 44-508(b) provides the definitions of "workman," "employee," or "worker," and states:

"Unless there is a valid election in effect which has been filed as provided in K.S.A. 44-542a and amendments thereto, such terms shall not include individual employers, limited or general partners or self-employed persons."

This definition evidences the legislature's intent to include a self-employed person under the Act. Here, it was uncontroverted that Thompson, as sole proprietor of Thompson Trucking, elected to be covered as an employee by his workers' compensation insurance under 44-542a. This was not the fact situation in *Allen*. A self-employed individual, such as Thompson, could be found to be a statutory employee of a principal if he had elected to be included as a workman under the Act and the other conditions of 44-503(a) were met.

(b) Contract with individual or business.

In *Robinson v. Flynn's Ferry Service, Inc.*, 6 Kan. App. 2d at 714, this court held that, where a principal contracted with the business and not with the owner-operator individually, 44-503(a) applied and the owner-operator was a statutory employee of the principal. Murfin and Reliance argue that Murfin contracted with Thompson individually and not with Thompson Trucking. This point is irrelevant if a self-employed individual who has elected to come under the Act can be a statutory employee under the provisions of the Act. Moreover, the only support given for their position is testimony from William Shropshire of Murfin in response to a question concerning whether Murfin called a contractor to clean the tanks involved in the accident. Shropshire responded: "Our field people obviously called Mr. Thompson and asked him to perform that service for us." In another part of his testimony, Shropshire stated: "[I]f you get a hole in the tank you will call someone like Mr. Thompson's trucking service to come out and move the oil from one tank to the other. When you have an occurrence such as this, you call someone to come out and clean." We do not conclude from this testimony that Murfin was contracting with Thompson individually.

Contrary to the district court's findings, we conclude Thompson was a statutory employee of Murfin Drilling.

## III. THOMPSON'S AVERAGE WEEKLY WAGE

Kansas Fire next contends the district court's finding of Thompson's average weekly wage was not supported by substantial competent evidence.

It was uncontroverted that Thompson elected to be covered as an employee by his workers' compensation insurance under K.S.A. 44-542a. However, his average weekly wage under K.S.A. 44-511 was at issue. After hearing the evidence, the ALJ determined Thompson's average weekly wage for the 26 weeks preceding the accident was $216.39. Kansas Fire contends this finding was not supported by substantial competent evidence.

The evidence in the present case, viewed in the light most favorable to Thompson, indicated that, although Thompson did not receive a fixed salary, the Thompson Trucking account was used to pay his personal expenses. Mina Thompson, who kept the company books for her husband's business, testified that she would write checks on the Thompson Trucking account for the personal expenses of both Thompson and herself. The amounts of these checks, written primarily for food, clothing, and home and auto insurance, were recorded under the heading "owner withdrawal" in the company ledger and fluctuated from month to month. None of the checks were made directly payable to Thompson or his wife and the withdrawals generally benefited both of them. This was the only evidence of income before the court. Mina testified that Thompson Trucking showed a tax loss for 1981 and no W-2 form was issued for Thompson. No personal or business income tax returns were presented.

K.S.A. 44-511(a)(3) provides:

"The term 'wage' shall be construed to mean the total of the money and any additional compensation which the employee receives for services rendered for the employer in whose employment the employee sustains an injury by accident arising out of and in the course of such employment."

K.S.A. 44-511(b)(5) provides:

"If at the time of the accident the money rate is fixed . . . on any other basis where the money rate is not fixed by the week, month, year or hour, . . . the average gross weekly wage shall be the gross amount of money earned during the number of calendar weeks so employed, up to a maximum of 26 calendar weeks immediately preceding the date of the accident, divided by the number of weeks employed, or by 26 as the case may be."

Mina testified that during the 26 weeks preceding Thompson's accident $5,626.05 was paid as owner withdrawals for personal expenses. The court divided this amount by 26 and arrived at an average gross weekly wage of $216.39. Kansas Fire argues this evidence is insufficient to establish Thompson's average weekly wage when the checks were not issued directly to Thompson. It contends that, even if the personal expenditures were an adequate basis from which to determine the average weekly wage, a portion of these expenditures was attributable to Mina, who benefited from them and who also worked for the business.

The case of *Justyna v. Logan Constr. Co.*, 10 Kan. App. 2d 249, 696 P.2d 977, *rev. denied* 237 Kan. 887 (1985), provides some guidance, but is not directly on point. Although the claimant in *Justyna* had an agreed wage of $315 per week, the claimant actually took a lesser wage when cash flow was low. We held that claimant's benefits were correctly calculated on the basis of the wages he had actually received. In the present case, however, Thompson did not have a fixed salary nor does it appear he received one in the usual fashion.

"Generally, profits from a business, whether commercial or farm, are not considered as wages for purposes of establishing average wage. But close questions have arisen in connection with corporate officers, who may also be stockholders, whose remuneration is not fixed but depends to some extent on the fortunes of the business. One court has held that the employee's share of profits was not the correct measure, but that the test should be the wage of another employee performing similar duties. When an amount of remuneration is specified, which can be taken in either cash or stock, the fact that the employee postponed exercising his option was held not to alter the fact that specified amount was an economic benefit which could form the basis of an average wage. But when the agreement was that the manager would be paid only when there were enough profits to bear the cost, this was found to be too speculative a contingency to construct an average wage upon—especially since, at the time in question, the corporation had not yet had any profits." 2 Larson's Workmen's Compensation Law § 60.12(e) (1987).

Since many wage earners support their families (paying for their food, clothing, and home and car insurance) from their average weekly wage, the "owner withdrawals" from the Thompson Trucking account which were used as wages could reasonably be the basis for Thompson's salary. We conclude the district court's finding that Thompson's average weekly wage was $216.39 is supported by substantial competent evidence.

## IV. SHREVE'S 90 PERCENT PERMANENT PARTIAL WORK DISABILITY.

Kansas Fire also contends the district court's finding that claimant had incurred a 90 percent permanent partial work disability was not supported by substantial competent evidence.

*Houston v. Kansas Highway Patrol*, 238 Kan. 192, 194, 708 P.2d 533 (1985), states the rules for determining permanent partial disability as follows:

" 'The test for determining permanent partial general disability is the extent to which the injured worker's ability has been impaired to engage in work of the same type and character he or she was performing at the time of the injury.'

" 'In considering a permanent partial general disability under K.S.A. 44-510e, the work disability would be measured by the reduction, expressed as a percentage, in the worker's ability to engage in work of the same type and character that he or she was performing at the time of the injury.'

" 'Where a claimant in a workers' compensation case is found to suffer a permanent partial general disability, the pivotal question is, what portion of claimant's job requirements is he or she unable to perform because of the injury?' "

See *Ploutz v. Ell-Kan Co.*, 234 Kan. 953, 676 P.2d 753 (1984).

When viewed in the light most favorable to the party prevailing below, the district court's judgment in the present case is supported by substantial evidence. *Baxter v. L.T. Walls Constr. Co.*, 241 Kan. 588, 591, 738 P.2d 445 (1987). See K.S.A. 77-621.

Dr. Mani, clinical director of the burn center at the University of Kansas Medical Center, testified that, as a result of the explosion and fire, Shreve suffered second- and third-degree burns to 55 percent of his body surface. Shreve underwent debridement, skin grafting, and wound care at the burn center from September 15 to October 25, 1981, at which time he was transferred back to the hospital in Hill City.

Dr. Hiebert, professor and program director of plastic surgery at the University of Kansas Medical Center, noted a 35 percent functional impairment to Shreve's upper left shoulder, arm, and hand, including a decrease in grip strength and hyperextension of the thumb. Hiebert also noted a 15 percent functional impairment to the lower extremities because of Shreve's inability to tolerate foot gear. An additional 15 percent functional disability to the body as a whole was caused by his inability to wear

clothing without discomfort. Hiebert testified that he assigned a 5 percent impairment to the body as a whole as a result of chronic bronchitis, assumed to have been sustained in the fire, for a total 60 percent functional impairment to the body as a whole. Hiebert's report also noted a 25 percent aesthetic disability which he testified was included in his 60 percent impairment rating. Therefore, Hiebert estimated an approximate 35 percent functional disability to the body as a whole.

Dr. Reddy, Shreve's treating physician in Hill City, estimated total body disability as 50 percent. Kansas Fire urges that Reddy's opinion regarding Shreve's ability to return to work not be considered because of "apparent lack of foundation for such an opinion." Reddy's testimony indicated he was aware Shreve worked for an oil company driving a truck and that the job included some exposure to the weather. This appears to be sufficient foundation upon which to base his general conclusions of the effects of the sun on Shreve's scar tissue.

The district court agreed with the ALJ's and the Director's findings that Shreve suffered from a permanent partial disability to the body as a whole of 90 percent.

"The distinction between functional disability and work disability has been accepted by this court in most instances without explanation. Functional disability is the loss of a part of the total physiological capabilities of the human body. Work disability is that portion of the job requirements that a workman is unable to perform by reason of an injury. Work disability generally carries a higher percentage of disability than functional disability." *Anderson v. Kinsley Sand & Gravel, Inc.*, 221 Kan. 191, 195, 558 P.2d 146 (1976).

Shreve testified that he had been a heavy equipment operator for a rock crushing and earth moving company prior to going to work for Thompson Trucking. Hired primarily for hauling salt water by truck and for tank cleaning, he worked approximately six weeks for Thompson Trucking before the accident on September 14, 1981. Although Shreve was released by his treating physician and returned to work in April 1984, he experienced medical difficulties. When exposed to sunlight or intense heat, the burned areas of his body would blister and bleed, exposing those areas to dust. Because of the burns to his rectal area, Shreve suffered difficulties during elimination, and sitting for prolonged periods led to perspiration which caused the burned

area to blister and burn. Shreve testified that 80 percent of his duties for Thompson Trucking involved truck driving.

Viewed in the light most favorable to the party prevailing below, there was substantial evidence to support the district court's finding that Shreve suffered from a permanent partial disability which rendered him unable to perform 90 percent of the jobs of the type and character he was performing for Thompson Trucking.

In summary, we affirm the district court on the coverage issue. There was substantial competent evidence to support the district court's findings on the issues of Thompson's wages and Shreve's disability; the district court's findings on those issues are also affirmed. We reverse the district court's finding that Thompson was not a statutory employee of Murfin Drilling and remand for further proceedings consistent with this opinion.

Affirmed in part, reversed in part, and remanded.