In re PHYSICIAN CORPORATION
OF AMERICA SECURITIES
LITIGATION.

No. 97–3678–Civ.

United States District Court,
S.D. Florida,
Miami Division.

Feb. 18, 1999.

Atlee Wampler, III, Wampler, Buchanan & Breen, P.A., Miami, FL, Jules Brody, Stull, Stull & Brody, New York City, Joseph M. Weiss, Weiss & Yourman, New York City, Stuart Savett, Savett, Fordkin, Podell & Ryan, PC, Philadelphia, PA, Robert Gilbert, Coral Gables, FL, Steven Toll, Cohen, Milstein, Mansfeld & Toll, Washington, DC, James M. Orman, Philadelphia, PA, Michael Pucillo, West Palm Beach, FL, for plaintiff.

Alexander Sussman, John Dellaportas, Fried, Frank, Harris, Shriver & Jacobson, New York City, Andrew S. Berman, Young, Berman, Karpf, PA, North Miami Beach, FL, for defendant.

### ORDER DENYING MOTION TO DISMISS

MIDDLEBROOKS, District Judge.

THIS CAUSE comes before the Court on Defendants' Joint Motion to Dismiss the Consolidated and Amended Complaint (DE# 31). The Court has reviewed the responsive pleadings and the other pertinent portions of the file and heard argument of counsel on this Motion on February 2, 1999. For the reasons set forth below, the Defendants' Motion to Dismiss is denied.

## I Facts

Plaintiffs bring this action against Defendants Physician Corporation of America (PCA) and four individual Defendants, Stanley Kardatzke, Peter Kilissanly, Clifford Donnelly, and Jay Grobowsky for violations of Sections 10(b) and 20(a) of the Securities Exchange Act of 1934, 15 U.S.C. §§ 78j(b), 78t(a) and Rule 10b–5 promulgated thereunder.[1] Plaintiffs assert this claim as a class action, on behalf of a class of all purchasers of PCA common stock during the period beginning March 31, 1996 through and including March 31, 1997.[2]

### A Background

For the purposes of this Motion to Dismiss, the Court takes the facts as alleged by Plaintiff in the Amended and Consolidated Complaint.[3] The background facts of the Section 10(b) and Rule 10b–5 claims are as follows. Until its acquisition by Humana, Inc., on September 8, 1997, Defendant PCA was a managed health care company which also provided workers' compensation coverage to employer

---

1. As stated in the Complaint, at all times relevant, Kardatzke was the Chairman of the Board of Directors and the Chief Executive Officer of PCA; Kilissanly was President, Chief Operating Officer, and a director of PCA, President and Chief Executive Officer of PCA/Florida as well as PCA Solutions; Donnelly was Senior Vice President of Finance and Chief Financial Officer of PCA; Grobowsky was PCA's Vice President of Finance.

2. The purported Class includes all purchasers within the Class Period, with the exception of "defendants, their officers and directors, the subsidiaries, affiliates and entities they control and officers and directors of such subsidiaries, affiliates and entities, and members of the immediate families of the Individual Defendants." Consolidated and Amended Class Action Complaint (DE# 28), ¶ 16. Paragraph citations hereinafter refer to the Consolidated and Amended Class Action Complaint.

3. Accordingly, the Court will dispense with the use of "allegedly" in the following narrative of facts.

groups. PCA's wholly owned subsidiary, PCA Solutions, participated in the workers' compensation market by providing third party administrative services to self-insured employee workers' compensation funds. PCA also participated in this market by directly underwriting workers' compensation policies and offering excess of loss reinsurance coverage. Workers' compensation policies were underwritten by PCA through its wholly owned subsidiary, PCA Property and Casualty Insurance Company, Inc. ("PCA P & C"). ¶ 3.

As a result of changes in the Florida workers' compensation market, in 1994 and 1995, PCA entered into negotiations with several self-insured funds[4] to structure an agreement in which PCA P & C would assume the assets and liabilities of those funds, in exchange for the employers purchasing workers' compensation insurance from PCA P & C. In July 1995, PCA commissioned a reinsurance risk management assessment to determine the capital necessary to support workers' compensation insurance policies that PCA would write for the two self-insured funds that PCA intended to acquire, Florida Business Mutual ("FBM") and Florida Builders and Employers Mutual Insurance Company ("FBE") [hereinafter "the Funds"]. The report indicated that approximately $50 million of additional capital would be necessary to support the future business written for employers insured by these funds. ¶ 27. This figure did not include the capital that would be necessary to support claims already incurred by the Funds. As to the prior claims, at the time the parties entered into the 1995 Consent Order discussed below, FBE financial statements for the year ended December 31, 1994, and interim quarterly statements for 1994 showed an $8.9 million surplus.[5] ¶ 31.

PCA P & C met with DOI in order to gain DOI approval for the assumption of FBE's insurance business; on November 14, 1995, DOI entered a Consent Order ("1995 Consent Order") establishing the terms on which this arrangement would go forward. The terms included PCA making a $60 million capital infusion to PCA P & C; PCA P & C making a 50% Quota Share Reinsurance Treaty for all Florida primary workers' compensation coverage written on or after October 1, 1995 for the period October 1, 1995 through December 31, 1995; and PCA P & C renewing all policies of FBM and FBE that would expire on or after December 31, 1995, effective January 1, 1996. 1995 Consent Order at 2; ¶ 30. As to FBM, PCA P & C "will assume all liabilities of FBM, via a loss portfolio transfer agreement, in accordance with the terms of the specimen agreement attached to this order as Exhibit 1. The effective date of the assumption is January 1, 1996, for all unpaid losses occurring

---

4. A self-insured fund is a fund established and funded by the employer (or group of employers) to pay workers' compensation claims and benefits for its employees. If the fund does not have sufficient assets to pay claims, the participating employer may be directly liable for benefits. To minimize this risk, the fund can obtain reinsurance, known as "stop loss" or "excess loss" insurance that is triggered when unusually large individual or aggregate claims are filed with the fund.

5. Under Florida law, property and casualty insurers administering and underwriting workers compensation policies must meet minimum financial requirements governing workers compensation policies. Fla.Stat. § 624.418(3) (1996). The failure of an insurer to meet the statutorily proscribed minimum reserve funding requirements is considered an immediate danger to the public health or welfare, and the Department of Insurance may revoke or suspend the certificate of authority of a statutorily impaired or insolvent insurer, or may take control of an insurer through rehabilitation proceedings. Plaintiffs maintain that this surplus was inadequate because the level of premiums FBE had written the previous year, without reinsurance, would require at least $50 million of surplus; and based on industry practice, even with 50% quota share reinsurance, a surplus of at least $25 million would have been necessary.

through December 31, 1995." In addition, FBM "will obtain an independent actuarial opinion on loss reserves to be ceded to PCA under the terms of the loss portfolio transfer agreement, that shall be filed on or before April 1, 1996." 1995 Consent Order at 3–4. As to FBE, PCA P & C "will issue an aggregate stop loss reinsurance policy to FBE, the effective date of which policy is January 1, 1996, and which is attached as Exhibit 3. The attachment point of this reinsurance shall be when all assets of FBE have been liquidated, any and all remaining losses and loss adjustment expenses shall be the responsibility of [PCA P & C]." Furthermore, PCA P & C agreed to renew all policies that expire December 31, 1995 and to assume all policies with expiration dates after January 1, 1996, effective January 1, 1996. 1995 Consent Order at 8–9.

## B Summary of Cause of Action

In summary, plaintiffs allege that by March 31, 1996, the start of the class period, defendants knew or recklessly disregarded that the workers' compensation businesses of the Funds (particularly FBE, a self-insured fund for which PCA P & C was financially responsible), was materially underreserved. PCA acknowledged a portion of the shortfall in confidential merger negotiations with Sierra Health Services, Inc. ("Sierra"), and in discussions with DOI. During the class period, however, Defendants did not report these adverse financial developments to the public, but rather issued numerous positive press releases and submitted SEC filings that did not disclose, and attempted to mask, this adverse information and its significance given the substantial liabilities assumed pursuant to the 1995 Consent Order. Specifically, PCA did not disclose to investors the material fact of FBE's underreserve, but instead issued public statements which misrepresented the financial condition of the workers' compensation business stating that it was having a positive impact on PCA's overall financial status; failed to disclose the serious problems PCA P & C was experiencing because of the assumption of the liabilities of materially underreserved funds; and misrepresented that PCA was in the process of turnaround and probable merger with Sierra on terms favorable to PCA. In actuality, PCA's workers' compensation business suffered a $284.4 million loss for fiscal year 1996.

As a result of the misrepresentations by Defendants, the price of PCA common stock was artificially inflated during the Class Period, and analysts continued to issue "buy" ratings. On March 31, 1997, the last day of the class period, when the full financial results for 1996 were disclosed, the price of PCA common stock, which had traded as high as $14.75 per share during the class period, closed at $4.625. Plaintiffs and other members of the Class purchased PCA common stock relying on the integrity of the market price and market information relating to PCA, or in the alternative, by relying directly upon defendants' materially false and misleading statements (that were made with knowledge of, or recklessness as to, their false and misleading nature), and have been damaged thereby.

## C Facts Pled Specifying Fraudulent Misrepresentations and Scienter

Plaintiff alleges the following materially false and misleading statements or omissions, including with each the explanation of why such statements were misleading and why the inference should be drawn that Defendants acted with scienter as to the specific statements.

(1) A November 30, 1995 press release stated that PCA P & C "will be responsible for satisfying existing policy claims" and that "the initial conversion is not expected to impact earnings."

(2) A February 20, 1996 press release stated PCA Solutions enjoyed an "exceptionally good year" and the workers' compensation company was an "excellent diversification strategy." These statements were false because PCA knew or should have known the liability assumed in the 1995 Consent Order would be large.

(3) In late March 1996, Defendants received FBE's audited financial statements for year ending December 31, 1995 showed $51.1 million deficit for that year, the first statement of deficit by FBE. Pursuant to GAAP and SEC regulations, upon learning of this deficit, defendants were required to disclose that PCA P & C's reserves were subject to an uncertainty of $51.1 million, record the liability and take a charge against earnings, and disclose the inadequacy of existing reinsurance for FBE.

(4) PCA filed a Form 10–K for fiscal year ending December 31, 1995, filed on April 1, 1996: Pursuant to GAAP, specifically Statement 5 of the Financial Accounting Standard Board ("FASB 5"), which provides that an estimated loss from a loss contingency shall be accrued by a charge to income if the loss is probable and the amount of the loss can be reasonably estimated, upon learning of FBE's $51.1 million deficit, defendants were required by the terms of the to record and take a charge against earnings.[6] ¶ 39. Also, based on FBE's audited statements showing the $51.1 million deficit, PCA did not make disclosures as required by Exchange Act Industry Guide 4, AICPA Audit and Accounting Guide for Audits of Property and Liability Insurance Companies or Item 303 of Regulation S–K, nor did PCA record a liability and take a charge against earnings. ¶ 44. The Form 10–K also stated that PCA P & C and the Funds had obtained the consent of DOI to transfer certain assets and all liabilities of the

Funds to PCA P & C that would be completed in the first quarter of 1996. ¶ 46.

(5) In a May 6, 1996 press release, PCA stated that results for the first quarter 1996, ended March 30, 1996, reflected "a turnaround in progress in its Florida operations" and that conversion of funds policies to PCA P & C purportedly increased revenues in the fourth quarter of 1995 and "exceeded management expectations." It further stated that revenues for the quarter increased 38% and net losses for the quarter narrowed to $4.9 million, or $0.13 per share.

(6) In the Form 10–Q for first quarter ending March 31, 1996, filed on May 16, 1996, PCA reported the results stated on May 6, 1996. During the same time period of Spring 1996, while in negotiations with Sierra, PCA disclosed that for purposes of applicable Florida insurance regulations, PCA P & C was underreserved by approximately $100 million. ¶ 55. In April 1996, PCA P & C management continued meetings with DOI and made numerous written submissions; and in May 1996, PCA began negotiations to enter into a reinsurance treaty for the funds with Center Reinsurance Company of New York ("Center Re"). ¶ 48.

(7) Based on public statements and SEC filings, the following analyst reports on PCA were issued: a June 18, 1996 report by Wasserstein Perella Securities maintaining a "buy" rating; a July 10, 1996 Chicago Report listing a "buy" rating; and a July 15, 1996 Robinson–Humphrey Report stating a continued long-term "buy" rating. ¶ 56, 58–59. A July 10, 1996 letter from PCA Solutions to DOI stated that PCA knew FBE and FBM had insufficient assets to pay amounts due on underlying loss transfer agreements, knew the Funds were unable to meet financial obligations

---

6. The Form 10–K and 10–Q documents submitted by PCA include a certificate of compliance with GAAP and SEC regulations.

under 1995 Consent Order, and knew of FBE's $51.1 million statutory deficit and FBM's $11.8 million statutory deficit—factors that militated against DOI approving the Center Re financial reinsurance transaction. ¶ 57.

(8) In an August 5, 1996 press release, PCA announced second quarter results for the period ended June 30, 1996, reporting net income of $5.3 million or $0.14 per share, and sequential improvement of PCA's earnings over the past three quarters. PCA further projected similar operating earnings improvement over the next several quarters while FBE's quarterly statement for quarter ended June 30, 1996 showed deficit was greater than $60 million. ¶ 65.

(9) The Form 10–Q for the quarter ended June 30, 1996, filed on August 13, 1996 was consistent with the prior August statement.

(10) In a September 25, 1996 press release, PCA announced that as a result of the sale of its Georgia and Alabama HMOs, it would record a $4.5 million gain on the transaction and was "back into the black." On November 4, 1996, PCA announced third quarter earnings for the quarter ended September 30, 1996, stating that there would be a one-time after-tax $100 million charge against the workers' compensation business and that additional funding was not anticipated. PCA stated that statutory equity had been substantially depleted and that "DOI may exercise certain oversight functions" with respect to operations. ¶ 75. By early September, DOI had refused to approve the Center Re reinsurance proposal, and PCA P & C retained the actuarial firm William Mercer to perform a new claims liability evaluation as to FBE and FBM. ¶ 68. By October 14, 1996, in a letter to DOI, PCA P & C acknowledged the significant deterioration of the financial position of FBM and FBE and that PCA P & C anticipated a $60 million deficit in FBE which would require further capital infusion by PCA P & C. ¶ 71.

(11) The ongoing negotiations with DOI resulted in the November 1996 Consent Order, in which DOI ordered PCA P & C under administrative supervision based upon DOI's determination that PCA P & C's projected capital and surplus was not in compliance with Florida statutory requirements. Effective September 30, 1996, PCA P & C assumed statutory financial reporting responsibility for the net liabilities of FBE and FBM. PCA P & C was prohibited from writing new or renewal business without DOI approval. On November 2, 1996, the boards of Sierra and PCA approved a merger agreement by which PCA would be merged into Sierra. At that time, PCA stated that the level of PCA P & C's underreserved condition was $100 million; by November 4, PCA informed Sierra that this estimate had risen to $130 million. ¶ 74.

(12) The Form 10–Q for third quarter ended September 30, 1996, filed on November 14, 1996, stated that preliminary actuarial evaluation indicated that FBE's liabilities exceed its assets by approximately $130 million as of September 30, 1996, and as a result PCA recorded a $100 million non-recurring charge, the future recoverability of which could not be assured. This filing did not disclose that there was additional liability on past losses and liabilities of FBE that would persist despite the discontinuance of issuing future policies and did not disclose the full extent of PCA P & C's financial condition. On November 15, 1996, however, in sworn statements to DOI, PCA P & C admitted to a deficit of over $48 million, including deficit of $105 million attributable to FBE. ¶ 87.

(13) On February 20, 1997, PCA reported results from William Mercer stating that PCA P & C's deficit would exceed previous estimates, and PCA would take

an additional $60 million charge in fourth quarter of fiscal year 1996 to cover workers' compensation liabilities, making PCA P & C underreserved by $190 million. That same day, Sierra announced that it was "seriously evaluating" its options. Later that day, PCA admitted that the charge would be $80 million, that it would put PCA into default on its bank debt, and that impact of this information on the merger was undetermined. ¶ 90. In response, PCA stock plunged 44%, dropping more than $4 per share, to close at $5.0625 on a volume of 3.7 million shares, more than eighteen times the Company's average daily volume for the prior three months. ¶ 91.

(14) PCA stated in a February 24, 1997 press release that fourth quarter operations, excluding the results of the workers' compensation subsidiary, were expected to earn between $3 million and $4 million before taxes, and that PCA was "surprised and disappointed" with the additional estimated losses incurred by workers' compensation business.

(15) In a February 25, 1997 press release of the same date, PCA stated that it was "shocked by the radical change in the financial status of these funds" and announced projected losses for workers' compensation for 1996 between $225 and $250 million. On that same date, the Florida State Treasurer and Insurance Commissioner issued an Order to Show Cause why P & C should not be taken into rehabilitation by DOI. On February 26, 1997, PCA lost additional value, closing at $3 ¹³⁄₁₆ per share. ¶ 94.

(16) On March 1, 1997, Sierra informed PCA that it would not proceed with the merger on the prior terms, but remained interested in acquiring PCA's Texas operations. This information was not disclosed until March 18, 1997, when Sierra announced the merger agreement was terminated. That day, PCA common stock closed at $4.25 per share. ¶ 96.

## D Events Signaling the Close of the Class Period

On March 31, 1997, PCA announced that its financial statement for the year ended December 31, 1996, recorded a net loss of $277.7 million, or $7.16 per share, compared to net loss for 1995 of $24.6 million, or $0.62 per share. PCA admitted that the workers' compensation business had a major negative impact on the Company's overall performance in 1996. Of the total pretax losses of $313.0 million, $284.4 million was attributable to the workers' compensation business, including a $38.9 million impairment of long-lived assets for the write-down of goodwill associated with PCA's TPA services. On April 1, 1997, the end of the Class Period, PCA common stock closed at $4 ⅝ per share, after trading as high as $14.75 during the class period. ¶ 97.

## II Motion to Dismiss Standard

For the purpose of the motion to dismiss, the complaint is construed in the light most favorable to the plaintiff, and all facts alleged by the plaintiff are accepted as true. *Hishon v. King & Spalding,* 467 U.S. 69, 73, 104 S.Ct. 2229, 81 L.Ed.2d 59 (1984). It is well-settled that a "complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts which would entitle him to relief." *Conley v. Gibson,* 355 U.S. 41, 45–46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957). The Court should ignore those allegations that contain no more than opinions or legal conclusions. *See South Florida Water Management Dist. v. Montalvo,* 84 F.3d 402, 409 n. 10 (11th Cir.1996).

■ "In determining whether to grant a Rule 12(b)(6) motion, the Court primarily considers the allegations in the complaint, although matters of public record, orders, items appearing in the record of the case, and exhibits attached to the ˙complaint,

also may be taken into account." *Watson v. Bally Mfg. Corp.,* 844 F.Supp. 1533, 1535 n. 1 (S.D.Fla.1993), *aff'd,* 84 F.3d 438 (11th Cir.1996), *citing to,* 5A Charles A. Wright and Arthur R. Miller, *Federal Practice and Procedure* § 1357, at 299 (1990). Where the plaintiff has referred to certain documents in the complaint that are "central to the plaintiff's claim," the Court "may consider the documents part of the pleadings for purposes of Rule 12(b)(6) dismissal, and the defendant's attaching such documents to the motion to dismiss will not require the conversion of the motion into a motion for summary judgment." *Brooks v. Blue Cross and Blue Shield of Florida, Inc.,* 116 F.3d 1364, 1369 (11th Cir.), *reh'g denied,* 116 F.3d 1495 (11th Cir.1997). In a securities fraud case, when deciding a motion to dismiss, the court also "may consider the contents of relevant public disclosure documents which (1) are required to be filed with the SEC, and (2) are actually filed with the SEC." *Lovelace v. Software Spectrum Inc.,* 78 F.3d 1015, 1018 (5th Cir. 1996); *accord Kramer v. Time Warner Inc.,* 937 F.2d 767 (2d Cir.1991). Thus, the Court shall consider the facts alleged in the complaint, those documents attached to or incorporated into the complaint, and matters that can be judicially noticed including SEC filings. *See Malin v. IVAX Corp.,* 17 F.Supp.2d 1345, 1352 (S.D.Fla. 1998) (stating that SEC filings required to be filed and actually filed are appropriate for judicial notice, therefore may be considered in evaluating a motion to dismiss).

For the purposes of this Motion to Dismiss, the Court will consider the Consolidated and Amended Complaint, filed June 1, 1998; the relevant 1995 and 1996 Form 10–K and Form 10–Q filings; and the 1995 and 1996 Consent Orders.[7]

## III Standard for Pleading Violations of Section 10(b) and 20(a)

In this one count Complaint, Plaintiffs argue that Defendants violated Section 10(b) of the Securities Exchange Act, 15 U.S.C. § 78j(b) [hereinafter "Section 10(b)"], and 17 C.F.R. § 240.10b–5 [hereinafter "Rule 10(b)–5"], by failing to disclose material facts and making false statements regarding PCA's workers' compensation business.

### A Section 10(b) and Rule 10b–5

■ Section 10(b) makes it unlawful for any person "[t]o use or employ, in connection with the purchase or sale of any security . . . any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the [SEC] may prescribe." 15 U.S.C. § 78j(b). Rule 10b–5 prohibits the making of any untrue statement of material fact or the omission of a material fact that would render statements made misleading in connection with the purchase or sale of any security. *See* 17 C.F.R. § 240.10b–5. To successfully state a securities fraud claim under Rule 10b–5, a plaintiff must show the following: (1) a misstatement or omission; (2) of a material fact; (3) made with scienter; (4) on which the plaintiff relied; (5) that proximately caused his injury. *See Ross v. Bank South, N.A.,* 885 F.2d 723, 728 (11th Cir.1989) (en banc), *cert. denied,* 495 U.S. 905, 110 S.Ct. 1924, 109 L.Ed.2d 287 (1990).

### B Federal Rule of Civil Procedure 9(b)

■ In order to survive a motion to dismiss, Plaintiffs' claim of fraud under

---

7. The Consent Orders, as well as the SEC filings, were referenced repeatedly by Plaintiffs in the Complaint as a basis of the allegations and in the Memorandum in Opposition to the Motion to Dismiss. At oral argument on this Motion, Plaintiff directed the Court to the Consent Orders and the SEC filings in

evaluating the sufficiency of the allegations at the pleading stage. In the Memorandum in Opposition, the Plaintiff cites to the copies of the Orders attached as Exhibits to Motion to Dismiss. These are public documents filed with the SEC and the DOI respectively.

Rule 10b–5 must also satisfy the requirements of Federal Rule of Civil Procedure 9(b), which requires that the "circumstances constituting fraud … must be stated with particularity." *See, e.g., Gross v. Medaphis Corp.,* 977 F.Supp. 1463, 1470 (N.D.Ga.1997). The Rule 9(b) standard assures fair notice to the defendants of the nature of the federal securities claims and the grounds for the claims, such that defendants have adequate information to frame a response. *See Harvey M. Jasper Retirement Trust v. Ivax Corp.,* 920 F.Supp. 1260, 1265 (S.D.Fla.1995). The Rule will be satisfied if the Complaint sets forth what statements or omissions were made in what documents or oral representation; the time and place of the statements or omissions; who made the statements; the content of the statement and the manner in which they misled the plaintiffs; and what the defendant "obtained as a consequence of the fraud." *Brooks v. Blue Cross and Blue Shield of Florida, Inc.,* 116 F.3d 1364, 1369 (11th Cir.), *reh'g denied,* 116 F.3d 1495 (11th Cir.1997).

### C Heightened Pleading Requirements under the Reform Act

■ Furthermore, the Private Securities Litigation Reform Act of 1995, Pub.L. No. 194–67, 109 Stat. 743, codified at 15 U.S.C. § 78u–4(b) [hereinafter "Reform Act"], establishes heightened pleadings requirements for certain private securities actions. If these additional requirements are not met, the Court shall dismiss the action. 15 U.S.C. § 78u–4(b)(3). Section 78u–4(b) imposes two requirements. First, the plaintiff must specify each statement alleged to have been misleading and the specific reason or reasons why such statement is misleading. 15 U.S.C. § 78u–4(b)(1).[8] This provision requires pleading with particularity all facts upon which the plaintiff is basing the fraud allegation, thus is even more specific than the Rule 9(b) standard. *Malin,* 17 F.Supp.2d at 1361.

Second, the would-be plaintiff, for each alleged misrepresentation, must "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u–4(b)(2).[9] Courts are split on the proper interpretation and application of this second requirement. Specifically, this provision mirrors language used in the pre-Reform Act, Second Circuit standard for pleading scienter. District courts have disagreed as to whether the statute should be read as adopt or rejecting previous Second Circuit caselaw on the standard for establishing scienter. The application of the § 78u–4(b)(2) pleading standard raises two interrelated questions: (1) whether recklessness remains a basis for establishing scienter; and (2) whether the "motive and opportunity" standard remains an independent basis for pleading with particularity the facts necessary to establish

8. Section 78u–4(b)(1) states:
 In any private action arising under this title in which the plaintiff alleges that the defendant—
 (A) made an untrue statement of a material fact; or
 (B) omitted to state a material fact in order to make the statements made, in the light of the circumstances in which they were made, not misleading;
 the complaint shall specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed.

9. Section 78u–4(b)(2), Required State of Mind, states:
 In any private action arising under this title in which the plaintiff may recover money damages only on proof that the defendant acted with a particular state of mind, the complaint shall, with respect to each act or omission alleged to have violated this title, state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind.

scienter (i.e., whether "motive and opportunity" evidence can give rise to the required strong inference). *Malin,* 17 F.Supp.2d at 1355.

### (1) The Required State of Mind under the Reform Act

The predicate question presented is what state of mind is required under the statute. When this is determined, the court can evaluate whether the specific facts alleged in the complaint create a strong inference that the defendant possessed that state of mind. The Supreme Court has defined scienter in the Rule 10(b) context as a mental state embracing intent to deceive, manipulate, or defraud. *See Ernst & Ernst v. Hochfelder,* 425 U.S. 185, 193 n. 12, 96 S.Ct. 1375, 47 L.Ed.2d 668 (1976). The Supreme Court expressly left open the question of whether scienter includes, not only intent, but also recklessness. *See McDonald v. Alan Bush Brokerage Co.,* 863 F.2d 809, 814 (11th Cir. 1989) (*quoting Ernst,* 425 U.S. at 193, n. 12, 96 S.Ct. 1375, stating that "[w]e need not address here the question whether, in some circumstances, reckless behavior is sufficient for civil liability under § 10(b) and Rule 10b–5."). Pre–Reform Act, the Circuits that had addressed the question had determined that recklessness met the scienter requirement. *See, e.g., Hollinger v. Titan Capital Corp.,* 914 F.2d 1564, 1568–70 (9th Cir.1990), *cert. denied,* 499 U.S. 976, 111 S.Ct. 1621, 113 L.Ed.2d 719 (1991); *In re Phillips Petroleum Securities Litigation,* 881 F.2d 1236, 1244 (3d Cir.1989); *Rolf v. Blyth, Eastman Dillon & Co. Inc.,* 570 F.2d 38, 44–47 (2d Cir.), *cert. denied,* 439 U.S. 1039, 99 S.Ct. 642, 58 L.Ed.2d 698 (1978). Specifically, the Eleventh Circuit held that scienter was satisfied by a showing of "severe recklessness." [10] *McDonald,* 863 F.2d at 814.

Since the enactment of the Reform Act's heightened standards, the Eleventh Circuit has not addressed the continuing validity of its previous holding that recklessness was sufficient to satisfy the scienter requirement. However, district courts in the Eleventh Circuit and district courts in the majority of other Circuits that have addressed this question have held that facts pleading recklessness satisfies the scienter requirement.[11] *See Sturm v. Marriott Marquis Corp.,* 26 F.Supp.2d 1358, 1368–9 (N.D.Ga.1998) (holding recklessness is sufficient to prove scienter under the Reform Act and rejecting argument that Reform Act requires a showing of conscious or intentional misbehavior); *Carley Capital Group v. Deloitte & Touche, L.L.P.,* 27 F.Supp.2d 1324, 1339 (N.D.Ga.1998) (same); *Malin v. Ivax Corp.,* 17 F.Supp.2d 1345, 1355 (S.D.Fla.1998) (stating the majority of courts to address the § 78u–4(b)(2) issue have codified the Second Circuit standard that included liability for recklessness); *In re Baesa Securities Litigation.,* 969 F.Supp. 238, 242 (S.D.N.Y. 1997) (holding the Reform Act "does nothing to disturb the substantive law of what is the required mental state for a securities fraud violation"); *Marksman Partners v. Chantal Pharmaceutical,* 927 F.Supp. 1297, 1309 n. 9 (C.D.Cal.1996) (rejecting argument that legislative history supports abolishment of liability for reckless con-

---

**10.** The Court further defined severe recklessness as "limited to those highly unreasonable omissions or misrepresentations that involve not merely simple or even inexcusable negligence, but an extreme departure from the standards of ordinary care, and that present a danger of misleading buyers or sellers which is either known to the defendant or is so obvious that the defendant must have been aware of it." *McDonald,* 863 F.2d at 814 (citations omitted) (further noting Seventh and Ninth Circuit cases holding that, rather than being merely a greater degree of ordinary negligence, recklessness is closer to a lesser form of intent).

**11.** At oral argument and in the pleadings, Defendants do not dispute that severe recklessness is a sufficient state of mind under the Reform Act. (Mot. to Dismiss at 9).

duct).[12]

### (2) Facts Sufficient to Give Rise to a Strong Inference of Scienter

The language of § 78u–4(b)(2) states that the plaintiff must plead specific facts that "give rise to a strong inference of the required state of mind." It is clear that a general averment, consistent with Rule 9(b)[13] is no longer sufficient to survive a motion to dismiss. The statute does not specify what "type" of facts shall suffice for "facts giving rise to a strong inference." As noted above, it is evident (1) that the "strong inference" language of the statute mirrors the language the Second Circuit had previously utilized, to enforce a comparatively more rigorous pleading requirement; and (2) that the intent of this Act was to establish more rigorous pleading requirements. The question again arises as to whether courts should interpret the statute to incorporate in full the prior Second Circuit standard. In the Second Circuit, prior to the Reform Act, plaintiffs were required to "allege facts that give rise to a strong inference of fraudulent intent" that "may be established either (a) by alleging facts to show that defendants had both motive and opportunity to commit fraud, or (b) by alleging facts that constitute strong circumstantial evidence of conscious misbehavior or recklessness." *Shields v. Citytrust Bancorp, Inc.*, 25 F.3d 1124, 1128 (2d Cir. 1994). Plaintiffs argue, and some courts have held, that the Reform Act is properly interpreted to incorporate the first prong of the above pleading standard as allowing the required strong inference to be demonstrated solely by facts showing "motive and opportunity."

In addition to the Eleventh Circuit district court cases of *Malin* and *Sturm* cited above, a substantial number of courts in various districts have determined that pleading facts solely on "motive and opportunity" is not sufficient to create the required strong inference. Specifically, the Court in *In re Baesa Securities Litigation*, 969 F.Supp. 238, 242, presented the following rationale in rejecting the prior Second Circuit motive and opportunity pleading standard:

> The [Reform Act] ... while adopting the "strong inference" requirement, makes no mention whatever of "motive and opportunity," nor singles out any other special kind of particulars as presumptively sufficient. The conclusion follows from the plain language of the statute that the mere pleading of motive and opportunity does not, of itself, automatically suffice to raise a strong inference of scienter. This, of course, does not mean that particulars regarding motive and opportunity may not be relevant to pleading circumstances from which a strong inference of fraudulent scienter may be inferred. In some cases, they may even be sufficient by themselves to do so. But, under the Reform Act, and in contrast to prior Second Circuit precedent, they are not presumed sufficient to do so. Rather,

---

**12.** A few district courts have interpreted the Reform Act as substantively altering the scienter requirement. *See, e.g., In re Silicon Graphics, Inc., Securities Litigation*, 1996 WL 664639 (N.D.Cal.1996) [hereinafter "Silicon Graphics I"]; *Friedberg v. Discreet Logic, Inc.*, 959 F.Supp. 42 (D.Mass.1997); *Norwood Venture Corp. v. Converse Inc.*, 959 F.Supp. 205, 208 (S.D.N.Y.1997). In view of previously existing Eleventh Circuit precedent, we are reluctant to follow that approach without express statutory authority.

**13.** Under Rule 9(b) of the Federal Rules of Civil Procedure, "[m]alice, intent, knowledge, and other condition of the mind may be averred generally." The Ninth Circuit applied this Rule to securities fraud actions, allowing plaintiffs to aver scienter generally, thus creating a comparatively less rigorous pleading standard than, in particular, the Second Circuit. *See In re GlenFed, Inc. Securities Litigation*, 42 F.3d 1541, 1546–7 (9th Cir. 1994), *superseded by statute as stated in Marksman Partners, L.P. v. Chantal Pharmaceutical*, 927 F.Supp. 1297 (1996).

under the Reform Act formulation, the pleadings must set forth sufficient particulars, of whatever kind, to raise a strong inference of the required scienter.

*See also Lirette v. Shiva Corp.*, 27 F.Supp.2d 268, 281 (D.Mass.1998); *In re Stratosphere Securities Litigation*, 1 F.Supp.2d 1096, 1107 (D.Nev.1998); *Novak v. Kasaks*, 997 F.Supp. 425, 430 (S.D.N.Y. 1998). *Cf. In re Silicon Graphics, Inc., Securities Litigation*, 970 F.Supp. 746, 757 (N.D.Cal.1997) [hereinafter "Silicon Graphics II"] (rejecting "motive and opportunity" pleading); *Norwood Venture Corp. v. Converse Inc.*, 959 F.Supp. 205, 208 (S.D.N.Y.1997) (same).

Some courts have come to the opposite conclusion, holding that the Reform Act's heightened requirements incorporate in full the Second Circuit caselaw on pleading scienter, including motive and opportunity pleading. *See Page v. Derrickson*, 1997 WL 148558, *9 (M.D.Fla.) (applying motive and opportunity test based on analogy of Reform Act standard to Second Circuit standard, as set forth in *Fischler v. AmSouth Bancorporation*, 1996 WL 686565 (M.D.Fla.1996)); *Fugman v. Aprogenex Inc.*, 961 F.Supp. 1190, 1195 (N.D.Ill.1997) (adopting in its entirety the Second Circuit pleading standard; citing *Rehm v. Eagle Fin. Corp.*, 954 F.Supp. 1246, 1250–53 (N.D.Ill.1997)); *see also Marksman Partners v. Chantal Pharmaceutical*, 927 F.Supp. 1297, 1311 (C.D.Cal.1996).

We disagree with Plaintiff's argument that "motive and opportunity" evidence alone will meet the pleading requirements in the Eleventh Circuit. Prior to the Reform Act, the Eleventh Circuit had not adopted such a specific rule. The text of the Reform Act does not explicitly incorporate this pleading standard, and the legislative history, frequently cited by both district courts and the parties to this suit, is not determinative on this question.[14] The parties agree that if it adopted wholesale the Second Circuit's motive and opportunity pleading standard, the Court would be parting company with Eleventh Circuit holdings on pleading requirements, perhaps effectively lowering the established standard. Absent a Congressional directive to do so, we decline Plaintiff's recommendation to follow Second Circuit caselaw and hold that facts of motive and opportunity alone are not sufficient to give rise to a strong inference of scienter.[15]

Accordingly the Court requires, consistent with the terms of the Reform Act and the precedent binding the Eleventh Circuit prior to the passage of the Act, that plaintiffs must set forth specific facts, of whatever kind, sufficient give rise to a strong inference of fraudulent intent. We will therefore address whether the Plaintiffs have plead with particularity facts giving rise to a strong inference of scienter, based on intentional or conscious wrongdoing or severe recklessness.

## IV Analysis of Plaintiffs Allegations on Section 10(b) and Rule 10(b)–5 Claims:

 Plaintiffs claim that Defendants made false and materially misleading

---

**14.** *But see In re Silicon Graphics II*, 970 F.Supp. 746 (reviewing pre-Reform Act cases and legislative history and concluding that plaintiffs must create a strong inference of "knowing or intentional misconduct" and that "[m]otive, opportunity, and nondeliberate recklessness may provide some evidence of intentional wrongdoing but are not alone sufficient to support scienter unless the totality of the evidence creates a strong inference of fraud.").

**15.** On the facts of this case, where Plaintiffs have plead knowing falsity, reckless disregard, and motive and opportunity, the Court will not evaluate motive and opportunity as an independent basis for alleging scienter. Of course these facts may be relevant to the ultimate determination of whether the scienter requirement is met.

statements and omissions in violation Section 10(b) and Rule 10b–5.[16] In accordance with the requirements for bringing a claim under Rule 10b–5, Plaintiffs have alleged that Defendants made misstatements and/or omissions of material fact, with scienter, in connection with the purchase of securities, upon which Plaintiff relied, and that reliance proximately caused Plaintiff's injury. Plaintiffs also maintain that they have stated with particularity the circumstances constituting fraud as required by Fed.R.Civ.P. 9(b). Defendants argue that this case should be dismissed because Plaintiffs have failed to meet the additional heightened pleading standards required under the Reform Act. The Court will consider this question prior to addressing the other arguments presented.

### A Section 78u–4(b)(1): Pleading with Particularity All Facts Upon Which Belief is Formed

Having carefully reviewed the Complaint for specific facts underlying the Plaintiffs' allegations, the Court finds that Plaintiff has specified the statements alleged to have been misleading and the reasons why such statements are misleading. Defendant does not argue that Plaintiff has failed to meet the requirements of 78u–4(b)(1). Accordingly, the Court will consider the second element of the heightened pleading requirement set forth in the Reform Act.

### B Section 78u–4(b)(2): Pleading with Particularity Facts Giving Rise to a Strong Inference of Scienter

As discussed above, in order to survive a motion to dismiss, Plaintiffs must plead facts, not solely based on motive and opportunity evidence, constituting strong circumstantial evidence of reckless or conscious misconduct. Defendant argues that the facts plead do not give rise to a strong inference of scienter as required by the Reform Act. Specifically, Defendants argue that they disclosed all of the relevant and material information that they knew and were required to disclose.

■■ Plaintiffs allege a course of conduct of numerous material misstatements and omissions based on the press releases issued by Defendants and the SEC filings submitted by Defendants. They allege that the Defendants knew of the deficits of the Funds and the liabilities that PCA P & C was responsible for as a result of the agreements it had made with the FBE; yet Defendants did not disclose this information in the public statements issued or the SEC forms filed during the class period.[17] Furthermore, Defendants materially misrepresented the financial condition of PCA and PCA P & C (indicating strong performance and expected improvement) and the value and liabilities of the Fund (indicating added value to PCA and attempting to ignore substantial past liabilities and underreserve) until the time of the close of the class period, when the full 1996 financial information was announced, reporting a net loss for PCA of $277.7 million.

Defendants argue that in order to evaluate whether scienter has been pled adequately, the plaintiff class should be bifurcated into two subclasses, one containing those individuals who purchased prior to July 1996—Plaintiffs Wells (June 4, 1996),

---

**16.** *See Part I, supra.*

**17.** The Court notes that failure to follow GAAP, without more, is not sufficient to establish scienter. *See, e.g., Fine v. American Solar King Corp.*, 919 F.2d 290, 297–98 (5th Cir. 1990), *cert. dismissed*, 502 U.S. 976, 112 S.Ct. 576, 116 L.Ed.2d 601 (1991). However, based on the particularities of the facts and circumstances alleged, facts demonstrating overstatement of revenues and income in violation of GAAP may constitute the false and misleading statements of material fact necessary for alleging a violation of Rule 10b–5. *See Gross v. Medaphis Corp.*, 977 F.Supp. 1463, 1472 (N.D.Ga.1997).

Morgan (June 4, 1996), and Applestein (June 12, 1996)—and another containing those individuals who purchased after the November 4, 1996 announcement—Plaintiffs Colton (November 4, 1996), Reiser (November 4, 1996), and Morgan (January 16, 1997). As a result of this bifurcation, Defendants argue, the claims of the "pre-July" plaintiffs should be dismissed because there are no facts pled demonstrating scienter for these purchasers (i.e., in 1995, PCA had not assumed the liabilities of FBE and was not required to report them; instead the liabilities were not assumed until the November 1996 Consent Order). Furthermore, Defendants state that the Complaint does not allege when the reinsurance obligation would be triggered, does not acknowledge that in 1995 P & C planned to reinsure these obligations (which later fell through), and does not allege that PCA had knowledge of the GAAP violations.

Defendants then argue that the claims of the "post-Announcement" plaintiffs should be dismissed because these individuals bought common shares after PCA had disclosed the $100 million charge and when the consummation of the Sierra merger was pending. Defendants allege that the scienter requirement is not met concerning the November 4, 1996 press release and the November 14, 1996 Form 10-Q; or, in the alternative, that the November statements were forward-looking and contained meaningful cautionary language, and thus are nonactionable under the "safe harbor" provision of the Reform Act, 15 U.S.C. § 78u–5(c)(1).

Defendants' contention that where, as in this case, there are a series of materially false and misleading statements, the Court must create what in effect is a separate class designated for each allegedly fraudulent statement is not persuasive. We find that Plaintiffs have satisfied the pleading requirements under the Reform Act and the relevant statutes. As to the earlier purchasers, Plaintiffs persuasively argue that some of the issues raised herein on materiality, reporting requirements and interpretation of the agreements between the Defendants, the Funds, and DOI are fact issues, not properly determined by the Court at the motion to dismiss stage. As to the later purchasers, we find that Plaintiffs have pled sufficient facts giving rise to a strong inference of recklessness or knowing misconduct as to those statements. Further, the statutory safe harbor, created to allow for projections, does not protect defendants from liability based on "statements that misrepresent historical/hard or current facts." *Gross v. Medaphis Corp.*, 977 F.Supp. 1463 (N.D.Ga. 1997). While it is possible that further development of the facts of this case could result in a determination that some of these statements fall within the safe harbor provision, plaintiffs further argue that the warnings were misleading in light of what defendants allegedly knew or should have known. The Court finds that granting a motion to dismiss these claims would not be appropriate. *See, e.g., Harvey M. Jasper Retirement Trust v. Ivax Corp.*, 920 F.Supp. 1260, 1268 (S.D.Fla.1995).

This preliminary ruling will not affect any later determinations on the merits of a motion for class certification, or if appropriate, the class period that would be certified or the appropriateness of creating subclasses. Given that the pleading requirement is recklessness or knowing falsity, it is not appropriate to dismiss the claims of certain purchasers based on lack of scienter on the date of purchase where the purchasers have adequately alleged scienter by presenting facts giving rise to a strong inference that the Defendants acted with the required state of mind on the separate and specific dates pled.

**V Statute of Limitations Claim barring Plaintiffs bringing claims for actions prior to November 14, 1997.**

Continuing with the Defendants' analysis that (1) the Plaintiff class should be

split, and (2) the claims of the "pre-July" plaintiffs should be dismissed, Defendants argue that pre-July Plaintiffs' claims are time barred as they were brought on November 21, 1997, more than one year after they discovered the facts constituting the violation they allege. Specifically, Defendant claims that Plaintiffs allege failure to disclose (1) that pursuant to the 1995 Consent Order, PCA P & C had assumed all of the liabilities of the Funds, and lacked sufficient reserves to cover those liabilities; and (2) that by the Spring of 1996, those funds (and thus P & C) had accrued unreported liabilities of between $51 million and $100 million. Defendant argues that the November 4 press release and the November 14 filing of PCA's Form 10–Q disclosed these problems and served as inquiry notice to the pre-July plaintiffs; accordingly, Plaintiffs' one-year statute of limitations for bringing their claims expired several days prior to November 21, 1997, the date this Complaint was filed.

■ Proof that a claim is barred by the applicable statute of limitations is grounds for granting a motion to dismiss. *Hunt v. American Bank & Trust Co.*, 783 F.2d 1011, 1013 (11th Cir.1986) The statute of limitations for bringing securities claims is "one year after the discovery of the facts constituting the violation." *Lampf, Pleva, Lipkind, Prupis & Petigrow v. Gilbertson*, 501 U.S. 350, 364, 111 S.Ct. 2773, 115 L.Ed.2d 321 (1991). For the purposes of the statute of limitations, "what matters is not when the information was actually known, but rather when in the exercise of due diligence it should have been known." *Hunt*, 783 F.2d at 1014. Defendants bear the burdens of production and persuasion as to a statute of limitations defense. *See Carley Capital Group v. Deloitte & Touche, L.L.P.*, 27 F.Supp.2d 1324, 1341 (N.D.Ga.1998) (denying strict construction of inquiry notice based on press release and subsequent filing of lawsuits). While the Court notes that public filings such as

10–K and 10–Q reports may be sufficient to put shareholders on notice, *see Reisman v. KPMG Peat Marwick, L.L.P.*, 965 F.Supp. 165, 171 (D.Mass.1997), the Eleventh Circuit has stated that "questions of notice and due diligence are particularly suited for a jury's consideration." *Kennedy v. Tallant*, 710 F.2d 711, 716 (11th Cir.1983).

■ In this case, Defendants allege that inquiry notice was triggered by the November 4 and November 14 disclosures. Although these statements may have been warning signs to the future plaintiffs, the Court cannot conclude as a matter of law that the statements alone provided inquiry notice of the Defendant's reckless or intentional misconduct absent the later financial disclosures.

## VI False Statements to Analysts

■ Section 10(b) liability can be predicated on a defendant's false statement to securities analysts or to the financial or news media. *See Basic v. Levinson*, 485 U.S. 224, 228, n. 4, 108 S.Ct. 978, 99 L.Ed.2d 194 (1988). *See also In re John Alden Fin. Corp. Securities Litigation*, Case No. 95–0830–CIV–NESBITT (S.D.Fla.1996); *Harvey Jasper Retirement Trust*, 920 F.Supp. at 1267. A company may be held liable for statements made to analysts that reach the market, where the plaintiff alleges entanglement between the Company's executives and the analysts. *See, e.g., Bryant v. Apple South, Inc.*, 25 F.Supp.2d 1372, 1382 (M.D.Ga.1998); *Gross v. Medaphis*, 977 F.Supp. 1463, 1474 (N.D.Ga.1997).

■ As alleged by Plaintiffs, Defendants used private securities analysts to mislead the public about the financial condition of PCA and its operations. Plaintiffs allege that it was PCA's practice to have officers communicate with analysts frequently, in conference calls, meetings

**1320**

and analyst briefings, in order to falsely present the operations and allegedly successful prospects of PCA to the marketplace and inflate artificially the price of PCA common stock. Plaintiff identifies four specific materially false and misleading reports, (¶ 56, 59–60), and the practices that led to the issuance of such reports, (¶ 101–106). In the context of the entirety of the facts alleged in the complaint, we find that these claims for liability allege sufficient facts to survive a motion to dismiss.

**VII Section 20(a) Controlling Persons Liability**

 Section 20(a) of the Exchange Act provides that "every person who, directly or indirectly, controls any person liable under any provision of this chapter or any rule or regulation thereunder shall be liable jointly and severally with and to the same extent as such controlled person." 15 U.S.C. § 78t(a). *See Brown v. Enstar Group, Inc.,* 84 F.3d 393 (11th Cir.1996). Based on oral and written statements including press releases and SEC and DOI filings, Plaintiffs have alleged facts that would make Section 20(a) applicable to each of the Defendants in this case. *See* ¶ 14, 15, 34–36, 45. Defendants' sole argument for dismissal is that because plaintiffs have failed to plead any claims under Section 10(b) and Rule 10b–5, the Section 20(a) claims also must fail. Because the Court denies the motion to dismiss as to the substantive securities fraud claims, the motion to dismiss as to the 20(a) claims is denied as well.

**VIII Conclusion**

For the reasons stated above, it is hereby ORDERED AND ADJUDGED that Defendants' Joint Motion to Dismiss the Consolidated and Amended Complaint (DE# 31) is DENIED.