**VAN ENTERPRISES, INC., Plaintiff,**

v.

**AVEMCO INSURANCE COMPANY and HCC Benefits Corporation, Defendants.**

**Civil Action No. 01–2481–KHV.**

United States District Court, D. Kansas.

Oct. 16, 2002.

William M. Modrcin, Dennis L. Davis, R. Dennis Wright, Claire Renee Mattan, Stinson, Morrison, Hecker, LLP, Kansas City, MO, for Plaintiff.

Daniel F. Church, Byron A. Bowles, McAnany, Van Cleave & Phillips, P.A., Roeland Park, KS, Carl A. Gallagher, Patrice M. Brown, McAnany, Van Cleave & Phillips, P.A., Kansas City, KS, for Defendant.

## MEMORANDUM AND ORDER

VRATIL, District Judge.

Van Enterprises, Inc. (Van) filed suit against AVEMCO Insurance Company (AVEMCO) and HCC Benefits Corporation (HCCB)[1] for breach of contract under a stop loss and excess loss insurance policy issued by AVEMCO. This matter is before the Court on Defendant AVEMCO's Motion For Summary Judgment (Doc. # 35) and Plaintiff's Motion For Summary Judgment (Doc. # 37), both filed June 21, 2002. For reasons stated below, both motions are overruled.

### Summary Judgment Standards

Summary judgment is appropriate if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law. See Fed.R.Civ.P. 56(c); accord *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Vitkus v. Beatrice Co.*, 11 F.3d 1535, 1538–39 (10th Cir.1993). A factual dispute is "material" only if it "might affect the outcome of the suit under the governing law." *Anderson*, 477 U.S. at 248, 106 S.Ct. 2505. A "genuine" factual dispute requires more than a mere scintilla of evidence. Id. at 252, 106 S.Ct. 2505.

The moving party bears the initial burden of showing the absence of any genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *Hicks v. City of Watonga*, 942 F.2d 737, 743 (10th Cir.1991). Once the moving party meets its burden, the burden shifts to the non-moving party to demonstrate that genuine issues remain for trial "as to those dispositive matters for which it carries the burden of proof." *Applied Genetics Int'l, Inc. v. First Affiliated Sec., Inc.*, 912 F.2d 1238, 1241 (10th Cir.1990); see also *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986); *Bacchus Indus., Inc. v. Arvin Indus.*, Inc., 939 F.2d 887, 891 (10th Cir.1991). The non-moving party may not rest on its pleadings but must set forth specific facts. *Applied Genetics*, 912 F.2d at 1241.

"[W]e must view the record in a light most favorable to the parties opposing the motion for summary judgment." *Deepwater Invs., Ltd. v. Jackson Hole Ski Corp.*, 938 F.2d 1105, 1110 (10th Cir.1991). Summary judgment may be granted if the non-moving party's evidence is merely colorable or is not significantly probative. *Anderson*, 477 U.S. at 250–51, 106 S.Ct. 2505. "In a response to a motion for summary judgment, a party cannot rely on ignorance of facts, on speculation, or on suspicion, and may not escape summary judgment in the mere hope that something will turn up at trial." *Conaway v. Smith*, 853 F.2d 789, 794 (10th Cir.1988). Essentially, the inquiry is "whether the evidence presents a sufficient disagreement to require submission to the jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson*, 477 U.S. at 251–52, 106 S.Ct. 2505.

---

1. The parties have stipulated to the dismissal of HCCB as a defendant because it acted solely as an agent of AVEMCO. See Pretrial Order (Doc. # 34) filed May 22, 2002 at 26.

## Factual Background

For purposes of the cross motions for summary judgment, the following facts are uncontroverted, deemed admitted or, where disputed, each party's factual contention is stated.

Van is a Kansas corporation involved primarily in the automobile business. To maintain health and certain other benefits for its employees, Van established a self-funded insurance plan, the Van Enterprises Employee Benefit Trust Health Care Plan (the "Plan"), which is subject to the Employee Retirement Income Security Act (ERISA), 29 U.S.C. § 1001 *et seq.*[2] The Plan is a substitute for health insurance purchased from an insurance carrier. Van's individual automobile dealerships pay premiums into the Plan on behalf of employees or at some dealerships, employees do so for themselves and their dependents. Premiums paid into the Plan are also intended to cover the cost of reinsurance. Van considered employees who enrolled in the Plan to be insureds.

Gallagher Benefits Administrators, Inc. and Gallagher Benefit Services, Inc. (collectively "Gallagher") acted as the agent for Van. AVEMCO is a Maryland property and casualty carrier which sells, among other things, stop loss and excess loss insurance products. HCCB acted as the agent for AVEMCO. Van, through its agent Gallagher, purchased a stop loss and excess loss insurance policy from AVEMCO, through its agent HCCB, for calendar year 2000. Stop loss and excess loss health insurance policies provide reimbursement to the employer for eligible health care expenses in excess of a certain specification (or attachment point). A self insurer can obtain stop loss or excess loss coverage at varying levels based on the premium amount it wants to pay. For the policy at issue, the stop loss and excess loss coverage specification (or attachment point) was $125,000 per employee. In other words, AVEMCO agreed to reimburse Van, as the Plan Sponsor, for the medical expenses of each employee in excess of $125,000. AVEMCO did not have an obligation to reimburse individual employees directly. Representatives of Van, Gallagher and HCCB repeatedly referred to the Policy as one of reinsurance.

Prior to January 1, 2000, plaintiff's stop loss and excess loss carrier was Employer's Reinsurance Corporation. Beginning in September 1999, however, Gallagher began shopping for a new carrier. HCCB sent Gallagher a proposal and after Gallagher submitted additional information concerning the Plan, including up-dated large claim notifications, HCCB provided a more detailed quote. The terms and conditions of the quote were subject to review and approval by HCCB of Van's final "Plan Document."

On or about January 4, 2000, Gallagher advised HCCB that its quote had been approved and that the stop loss and excess loss policy would be purchased through HCCB. On or about January 7, 2000, HCCB sent Gallagher a transmittal letter with a number of enclosures to be executed by Van. Among the enclosures was a blank Disclosure Statement form, and partially completed Application and Schedule of Insurance forms. Following its normal business practices, before sending the forms to Gallagher, HCCB completed all of the items on the Application and Schedule of Insurance forms with the exception of Question 11 on the Application, which asks:

11. Have you read, fully understood, and completed to the best of your knowledge the attached Disclosure Statement?

---

2. ERISA generally preempts state insurance laws with respect to self-funded benefit plans sponsored by single private employers. Such plans are subject only to federal requirements under ERISA.

[ ] Yes [ ] No

With regard to the completion of Question 11, HCCB gave Gallagher the following bold admonition in the January 7th transmittal letter:

> **On the enclosed Application, please pay particular attention to Item Number 11. This must be completed, otherwise the Application will not be accepted.**

On the Disclosure Statement, in response to the question to identify "shock losses— potential catastrophic claims, any on-going and/or claims exceeding 50% of specific deductible," Gallagher responded "please see attached individual excess claims and large claim notifications." The attached documents included information for individual excess claims and large claim notifications for calendar year 1999. The information in and attached to the Disclosure Statement was written or provided by Gallagher as agent for Van. The first paragraph of the Disclosure Statement reads:

> To the best of our knowledge, the Plan Sponsor [Van] and our Agent, the Claim Administrator, have done a diligent review and have listed below all details of Shock Losses during the past twelve (12) months, as well as any on-going or potential claims. Please pen the word "NONE" if do not have any Shock Losses, COBRA's or Disabled lives.

In the insurance industry, a shock loss or shock information is commonly known as a claim that exceeds or has the potential to exceed the group's specification (attachment point). A shock loss would include a claim that has already gone over one-half of the group's specification, i.e. if the group's specification is a $125,000 deductible, it is a shock loss if claims exceed

$62,500. Shock losses also include claims that have the potential to go over one-half of the $125,000 deductible.

Megan Elliott was the dependent child of one of Van's employees, Christopher Elliott, an insured under the Plan. Megan was first diagnosed with spinal muscle atrophy in October of 1999, and Mr. Elliott and his family first became insured on December 1, 1999. Spinal muscle atrophy is the wasting of skeletal muscle due to progressive degeneration of anterior horn cells in the spinal cord and motor nuclei in the brain stem. Type 1 spinal muscle atrophy is usually fatal by age 4. Type 2 spinal muscle atrophy may also be fatal in early life; if it is not fatal, the child will nonetheless have permanent progressive weakness. In either case, Gallagher would initiate the large case management process because of the potential medical expenses.

On or about December 29, 1999, Med Trac notified Amy Frazier, a registered nurse for Gallagher, that Megan suffered from spinal muscle atrophy and had been hospitalized with pneumothorax since December 9, 1999. On December 29, 1999, Frazier called Linda Wisdom, the claims manager for Van's Plan, and left a voice mail message asking permission to open large case management to see if Gallagher could develop a plan to prevent Megan's re-hospitalization. Later that same day, Frazier spoke with Wisdom about Megan's hospitalization. Frazier asked for permission to open large case management. Wisdom informed Frazier that she was going to investigate Megan's claim as a possible pre-existing illness.

On January 4, 2000, Wisdom orally authorized Vickie Goodrich, a registered nurse and case manager for Gallagher, to open large case management for Megan's illness.[3] On or about January 5, 2000,

---

**3.** Goodrich testified that as of January 4, 2000, she understood that Van had not determined that Megan was entitled to benefits.

In fact, Wisdom had not determined whether Megan's illness would be covered by the Plan.

Wisdom signed and returned a large case management approval form which noted that Megan had been diagnosed with spinal muscle atrophy and that she had been hospitalized with pneumothorax from December 20 through December 24, 1999 and re-hospitalized on December 25, 1999. At that time, Wisdom understood that hospitalizations of that length could cause substantial risk of financial obligation for the Plan, but she did not understand the diagnosis of spinal muscle atrophy and did not educate herself to understand what the diagnosis meant, either to Megan or to the risk of loss to the Plan. Goodrich commenced preparation of a Medical Care Management Initial Report for Megan, which she completed on January 17, 2000.

The Disclosure Statement which Gallagher completed did not contain any information regarding Megan's diagnosis of spinal muscular atrophy. Gallagher delivered the forms to James Thayer, Van's Chief Financial Officer, and asked him to disclose any additional information and then sign the Application and Disclosure Statement. On January 17, 2000, on behalf of Van, Thayer signed the Application, Schedule of Insurance, and Disclosure Statement and returned them all to Gallagher. Thayer signed the Disclosure Statement on January 17, 2000, but made no inquiries regarding any other shock losses or disabled lives; he simply signed what Gallagher asked him to sign and returned the papers to Gallagher. When he signed the Application and Schedule of Insurance, Thayer left the answer "yes" or "no" to Question 11 blank and did not initial an addendum to the Application and an addendum to the Schedule of Insurance in the space provided for the Plan sponsor's initials. HCCB returned the schedule and addendums to Gallagher to obtain Thayer's

initials and to have the Schedule of Insurance signed by a witness from Gallagher. The initials and signature were obtained as requested. During the application process, Gallagher did not ask Wisdom, Van's claims manager, whether there were other shock or potential shock losses or disabled lives. The only disclosures made to HCCB were large claim notifications. When obtaining information for the Disclosure Statement, and in accordance with its standard practice, Gallagher did not request information from its own large claim management department. The Disclosure Statement and attachments as completed by Van and Gallagher did not mention Megan.

Michael Swanberg was an Excess Consultant for Gallagher in the office at Lisle, Illinois. Swanberg's job duties included the completion of Large Claim Notification (LCN) forms for AVEMCO and the other stop loss and excess loss insurance carriers with which Gallagher did business. Swanberg's job duties did not include the actual mailing of LCN forms to carriers. Darlene Painter, a Technical Administrative Assistant with Gallagher, was responsible for that task.

On January 24, 2000, following normal business practices, Swanberg completed a LCN form for Megan's diagnosis. Swanberg testified that he gave Painter the form and the Medical Care Management Initial Report without any specific instructions for mailing. Painter has no recollection of mailing the LCN form on Megan, but she testified that based on her standard practice, if she were given such a form, she would have mailed it to the HCCB office in Kennesaw, Georgia. HCCB had previously approved the LCN form for sending notices under Section 5 of

On February 8, 2000, however, Wisdom informed Goodrich that the pre-existing condition investigation on Megan's illness had been completed and that Megan was covered under the Plan.

the Policy, which requires the insured to send HCCB information detailing all payments for medial expenses the insured expects to make for a covered employee in excess of $62,500, or 50% of the $125,000 stop loss coverage level. Van maintains that Swanberg attached Megan's Medical Care Management Initial Report to the LCN and gave both documents to Painter to be mailed to HCCB in Kennesaw, Georgia. AVEMCO states that Swanberg gave the documents to Painter without specific instructions for mailing and that the documents may have been mailed to HCCB in Kennesaw, Georgia, or to Managed Group Underwriter's [4] office in Kansas City, Missouri, or not mailed at all at that time.[5]

On March 20, 2000, HCCB returned the Application and Schedule of Insurance to Gallagher to be initialed and witnessed. It did not ask Van to complete Question 11 on the Application. On April 11, 2000, Gallagher returned to HCCB the initialed and witnessed Application and Schedule of Insurance. On May 12, 2000, on behalf of AVEMCO, HCCB accepted the Application and Schedule of Insurance with an effective date of January 1, 2000 and issued the Policy with the Application and Schedule of Insurance attached. The Application was incomplete in that the "yes" or "no" answer to Question 11 was left blank and the Disclosure Statement was not attached to the Application. AVEMCO accepted the Application and Schedule of Insurance, and issued the policy without requiring Van to answer Question 11 and without attaching the Disclosure Statement because in fact Van had answered and signed the Disclosure Statement and

provided information regarding large claims. When asked to explain why HCCB had accepted the Application without requiring Van to complete Question 11, representatives of HCCB testified that HCCB policy was to accept applications without answers to Question 11 when HCCB had received signed disclosure statements from the insureds. When asked to explain why HCCB had issued the Policy without attaching the Disclosure Statement to the Application, Tina Armstrong, a Regional Service Manager for HCCB, testified that it was not HCCB policy to attach signed disclosure statements to accepted applications.

The parties have stipulated that the "contract of insurance" between them consists of: (1) a Schedule of Insurance, which Van signed and delivered on January 17, 2000 and which HCCB accepted on behalf of AVEMCO on May 12, 2000, (2) the Application (without Question 11 completed or the Disclosure Statement attached), which Van signed and delivered on January 17, 2000 and which HCCB accepted on behalf of AVEMCO on May 12, 2000, (3) Policy Number AIC5000002080 (the "Policy"), which AVEMCO issued on May 12, 2000 with the accepted Application and Schedule of Insurance attached thereto, and (4) the Plan Document for Van's self-insured employee benefit plan, which HCCB accepted on behalf of AVEMCO on August 7, 2000. Section 6 of the Policy provides in part:

> Misrepresentation—We have relied on information provided by the Plan Sponsor, the Plan Sponsor's representative,

---

**4.** Manager Group Underwriters (MGU) was wholly owned and operated by HCCB and in January 2000 shared office space with HCCB in Kansas City, Missouri.

**5.** Mary–Beth Thanos, an excess consultant for Gallagher, testified that Gallagher does not send LCNs to insurance carriers if a claim is

not covered. On January 17, 2000, when Swanberg purportedly mailed the LCN to HCCB, Van had not yet made a coverage decision on Megan's claim. AVEMCO concludes that Gallagher would not have sent a LCN form on Megan's illness before Van made a coverage decision.

or the Plan Supervisor in the documents which are part of the Contract. If that information has been materially misrepresented, We have the right to rescind the insurance provided to the Plan Sponsor under this Policy as of the effective date of such Insurance or the last annual renewal date, if later.

The underwriters at HCCB and MGU in the Kansas City office used the *Administrative Manual for Third Party Administrator.* This manual gives the person who is in charge of underwriting excess medical coverage the discretion to waive the requirement that the insured provide a list of individuals who have a serious claim diagnosis.

On or about May 19, 2000, Swanberg completed an initial large claim notification form and mailed it to the HCCB Kennesaw office for reimbursement of excess medical expenses which Van had incurred and paid to date on behalf of Megan. Representatives of HCCB testified that upon receiving this form, they checked their computerized records system and did not find a prior entry for Megan's LCN form. HCCB began to investigate whether Van had failed to disclose Megan as a shock loss, potential shock loss or disabled life at the time of the application. Had Van disclosed Megan's situation during the underwriting process, AVEMCO would have excluded expenses related to Megan's illness or would have increased the premium to cover the expected expenses.

On June 1, 2000, Janet Hart, a Claims Auditor for HCCB, sent Swanberg a letter which asked why Megan's diagnosis had not been disclosed before May 12, 2000. On June 15, 2000, Swanberg responded:

This claimant was not disclosed by my department at the time the policy was underwritten because we did not learn of her until after the effective date of the new policy year. On January 24, 2000, a Large Claim Notification was completed and sent to the Kansas City office of Managed Group Underwriters.

Swanberg later testified that his statement that Megan's LCN had been sent to MGU at its Kansas City office was a mistake and that he learned of the mistake after discussing the matter with Painter at the conclusion of her deposition. Swanberg testified that he did not recollect whether he had enclosed a copy of Megan's LCN form with his June 15th letter. Representatives of HCCB testified that in fact it discovered a copy of Megan's LCN form in the Kennesaw office shortly after it received Swanberg's letter of June 15th.

On August 7, 2000, HCCB accepted the Plan Document for plaintiff's self-insured employee benefit plan.

On September 7, 2000, AVEMCO denied the claim for Megan's medical expenses because Van did not disclose her as a potential shock loss or disabled life. On October 2, 2000, Van appealed AVEMCO's decision. On November 27, 2000, AVEMCO denied the appeal and offered to reform the contract as if Megan's condition had been disclosed on January 17, 2000. Van would not agree to reformation. Accordingly, on December 28, 2000, AVEMCO returned the policy premiums ($153,192.13) and informed Van that it was exercising its right to void the policy.

In calendar year 2000, Van paid medical expenses in the amount of $564,617.52 on behalf of Megan and seeks to recover $439,617.52 from AVEMCO pursuant to the Policy.

On August 10, 2001, Van filed suit against AVEMCO and HCCB in the District Court of Johnson County, Kansas for breach of contract. Specifically, Van sought to recover medical expenses which it had paid on behalf of Megan in excess of $125,000 and its attorney fees. AVEMCO and HCCB removed the action to this court. AVEMCO asserts that it properly

rescinded the Policy and therefore is not obligated to pay for Megan's medical expenses.

Van seeks summary judgment on AVEMCO's affirmative defense of rescission/fraud. Van argues that its representations in the Disclosure Statement were not part of the parties' insurance contract and that AVEMCO may not rely on the Disclosure Statement to rescind the Policy. AVEMCO also seeks summary judgment on its affirmative defense of rescission. AVEMCO argues that it properly relied on the Disclosure Statement which was part of the insurance contract and rescinded the Policy based on Van's misrepresentations.

### Analysis

### I. Van Enterprises' Motion For Summary Judgment

Van argues that AVEMCO cannot prevail on its affirmative defense of rescission because Van's alleged misrepresentation in the Disclosure Statement was not included in the insurance contract, that general contract principles and Kansas statutory law preclude AVEMCO's reliance on documents not included in an insurance contract, and that AVEMCO waived its right to rely on the Disclosure Statement because (1) it did not require Van to fully complete the Application, (2) it did not attach the Disclosure Statement to the Application or Policy, (3) it knew of Megan's diagnosis when it issued the Policy on May 12, 2000, and (4) it also knew of Megan's diagnosis when it accepted the Plan Document on August 7, 2000. AVEMCO maintains that (1) it properly relied on Van's statements in the Disclosure Statement because the Disclosure Statement was incorporated in the insurance contract or in the alternative, constitutes a separate contract, and (2) it did not waive its right to rely on the Disclosure Statement. The Court agrees with Van that its representations in the Disclosure Statement were not

part of the parties' insurance contract or a separate contract, but AVEMCO may rely on such representations as a basis to rescind the Policy to the extent that it was fraudulently induced to issue the Policy.

A. Whether The Disclosure Statement Is Part Of The Parties' Insurance Contract?

 AVEMCO concedes that the Disclosure Statement was not attached to the Application or Policy, but maintains that the Disclosure Statement was incorporated by reference in the Application, which was attached to the Policy. "Separate documents may become a part of a contract of insurance by law, by being annexed or attached to the policy, or by a clear reference in the policy that they are intended to be a part thereof. To have this effect, the intent to incorporate them should be plainly manifest and not dependent upon implication." 2 Couch On Insurance 3d § 18:23 at 18–34 (1997). The Kansas Court of Appeals has stated:

> An insurance contract may thus consist of several separate documents. But statements in a collateral document do not become a part of the contract of insurance unless they are so referred to therein as clearly to indicate that the parties intended to make them a part of such contract. In the absence of such clear reference, the rights and liabilities of the parties to a contract of insurance are to be determined by the terms of the policy itself, to the exclusion of other papers not made a part thereof.

*Thompson v. Harold Thompson Trucking,* 12 Kan.App.2d 449, 453, 748 P.2d 430, 434 (1987) (quoting 1 Couch on Insurance 2d § 3:24); see 13A John Alan Appleman & Jean Appleman, Insurance Law And Practice § 7536 at 140 (1976) (rider or other paper must be incorporated, attached, or referred to in instrument in so clear a

manner as to leave no doubt of parties' intention); 2 Couch On Insurance 3d § 18:1 at 18–3 (1997) (intent to make application part of contract must be clearly expressed; any doubt resolved against inclusion of application; intent to make application part of contract must appear on face of policy; statement on application alone will not suffice).

In this case, the Application does not specifically incorporate the Disclosure Statement. Question 11 of the Application reads:

> 11. Have you read, fully understood, and completed to the best of your knowledge the attached Disclosure Statement?
> [ ] Yes [ ] No

A "yes" answer to Question 11 might arguably raise a genuine issue of material fact regarding the parties' intent to incorporate the Disclosure Statement as part of the policy. Van, however, did not answer Question 11. Accordingly, the Disclosure Statement was not incorporated as part of the Application.[6] See *Thompson*, 12 Kan. App.2d at 453, 748 P.2d at 434.

■■■ In the alternative, AVEMCO argues that the Disclosure Statement constitutes a separate contract. Van maintains that the pretrial order did not preserve this argument. The Court disagrees. The Court will not permit a party to raise an entirely separate claim or defense than those asserted in the pretrial order, but it ordinarily will allow a party to raise a specific argument or factual contention which arguably is included within a general claim asserted in the pretrial order. See *Neide v. Grand Court Lifestyles, Inc.*, 38 F.Supp.2d 938, 943 (D.Kan.1999) (plaintiff allowed to clarify that ERISA claim in pretrial order was pursuant to Section 1132 rather than Section 1140); *Daneshvar v. Graphic Tech., Inc.*, 18 F.Supp.2d 1277, 1288 n. 15 (D.Kan.1998) (omission of entire theory from pretrial order constitutes waiver, but omission of specific position not fatal); *Long v. City Of Leawood, Kan.*, 6 F.Supp.2d 1249, 1252 n. 3 (D.Kan. 1998) (omission of entire theory from pretrial order constitutes waiver), aff'd, 202 F.3d 282, 2000 WL 14257 (10th Cir.2000). The Honorable Sam A. Crow of this district has held:

> Since it is intended to facilitate a trial on the merits, the pretrial order should not be used to defeat the lawsuit on a technicality or be construed in the spirit of a common law pleading. Instead, pretrial orders should be liberally construed to cover any of the legal or factual theories that might be embraced by their language. A policy of too-easy modification of pretrial orders not only encourages carelessness in the preparation and approval of the initial order, but unduly discounts it as the governing pattern of the trial. On the other hand, an unswerving insistence upon every provision, under all circumstances, may work grave injustice in individual cases.... Indeed, the Federal Rules reject the

---

**6.** Relying in part on *SW Nat'l Bank v. Simpson & Son, Inc.*, 14 Kan.App.2d 763, 799 P.2d 512 (1990), AVEMCO argues that the Disclosure Statement was incorporated by reference in the Application and hence the insurance policy. In SW Nat'l Bank, a standard form construction contract stated on the front page that the contract was to be used "only with the 1976 edition of AIA document A201, General Conditions for Construction." *Id.* at 769, 799 P.2d at 517. Document A201 was not attached to the policy and it was not identified in the section of the contract which listed all contract documents. The Kansas Court of Appeals nevertheless held that based on the language on the first page of the standard contract, AIA document A201 was incorporated by reference. Here, of course, Question 11 on the insurance application (being unanswered) is much more vague than the affirmative statement in SW Nat'l Bank that the contract was to be "[u]se[d] only with the 1976 edition of AIA document A201, General Conditions for Construction."

approach that pleading is a game of skill in which one misstep by counsel may be decisive to the outcome and accept the principle that the purpose of pleading is to facilitate a proper decision on the merits.

*Koch v. Koch Indus., Inc.*, 179 F.R.D. 591, 596 (D.Kan.1998) (citations and quotations omitted).

Here, the Pretrial Order (Doc. # 34) states: "[d]efendant contends that the plaintiff's failure to disclose information in the disclosure statement for a known risk violated the terms of the contract *and the disclosure statement itself.*" Id. at 16 (emphasis added). In AVEMCO's detailed statement of this defense, it did not affirmatively assert whether the Disclosure Statement was a part of the insurance policy or a separate contract. See id. at 20–22. AVEMCO could have more clearly articulated its alternative theories that the disclosure statement was part of the insurance policy and that the disclosure statement was a separate contract, but based on its general contention that Van's omissions in the Disclosure Statement "violated the terms of the contract and the disclosure statement itself," AVEMCO adequately preserved its arguments. Id. at 16.

■ As to the substance of AVEMCO's argument that the Disclosure Statement constitutes a separate contract, Van states only that the argument "is so fantastic that it is nigh impossible for plaintiff to craft a pertinent reply other than to say that it has no basis in the law or facts of this case." Plaintiff's Reply In Support Of Motion For Summary Judgment (Doc. # 42) filed July 23, 2002 at 9. The Court agrees that AVEMCO has not presented sufficient evidence that the Disclosure State-

ment is a separate binding contract. Van promised to truthfully disclose information in the Disclosure Statement, but AVEMCO did not give any corresponding consideration. AVEMCO was not legally obligated to issue a policy or take any other action based on the Disclosure Statement. See *Dugan v. First Nat'l Bank*, 227 Kan. 201, 211, 606 P.2d 1009, 1017 (1980) (to be legally enforceable, contract must be supported by consideration); *Berryman v. Kmoch*, 221 Kan. 304, 309, 559 P.2d 790, 795 (1977) (to be sufficient consideration, promise must impose legal obligation on promisor). Accordingly, AVEMCO cannot prevail on the theory that the Disclosure Statement is a separate contract.[7]

**B. Whether Van's Representations In Documents Extrinsic To The Insurance Contract Are A Valid Basis For A Fraudulent Inducement Defense?**

■ Van argues that pursuant to the contract of insurance, AVEMCO may rely only on information in documents that are a part of the insurance contract. The Policy provides:

> Misrepresentation—We have relied on information provided by the Plan Sponsor, the Plan Sponsor's representative, or the Plan Supervisor in the documents which are part of the Contract. If that information has been materially misrepresented, We have the right to rescind the insurance provided to the Plan Sponsor under this Policy as of the effective date of such Insurance or the last annual renewal date, if later.

Based on this provision, Van argues that AVEMCO may rescind the Policy only if the information contained *in the contract documents* has been materially misrepre-

---

7. Even though the Disclosure Statement is not part of the Policy and is not a separate contract, AVEMCO may nevertheless rescind the Policy based on its defense that Van's statements/non-disclosures in the Disclosure Statement were fraudulent and induced AVEMCO to issue the Policy. See infra text, part I.B.

sented. The Court disagrees. Nothing in the above clause precludes AVEMCO from requesting and relying on additional information and disclosures not included in the contract documents. Moreover, the Policy does not contain a complete integration clause which would preclude reliance on extrinsic materials, either oral or written, and plaintiff's representations in the Disclosure Statement are not directly at variance with the Policy such that merger of the representations should be implied. See *Jack Richards Aircraft Sales, Inc. v. Vaughn,* 203 Kan. 967, 973, 457 P.2d 691, 696 (1969) (oral promise which is directly at variance with contemporaneous written contract is deemed merged into final written contract). Finally, even if the Policy contained a complete integration clause, AVEMCO's rescission defense is essentially a claim for fraudulent inducement which is not precluded unless the alleged representation directly contradicts the terms of the Policy. See *Miles Excavating, Inc. v. Rutledge Backhoe & Septic Tank Servs., Inc.,* 23 Kan.App.2d 82, 84, 927 P.2d 517, 518 (1996) (parol evidence admissible to show fraud in inducement of contract even where contract contains provision stating that parties have not relied on any representations other than those contained in written contract); *Ramada Franchise Sys., Inc. v. Tresprop, Ltd.,* 188 F.R.D. 610, 615–16 (D.Kan.1999) (same). The representations in the Disclosure Statement do not contradict to any extent the terms of the Policy. In sum, under ordinary contract principles, Van's statements in the Disclosure Statement, a document extrinsic to the insurance contract, may form a valid basis for AVEMCO's rescission (fraudulent inducement) defense.

 In the alternative, Van argues that pursuant to K.S.A. § 40–2205(a), its representations in the Disclosure Statement cannot form a basis for AVEMCO's rescission defense. K.S.A. Section 40–2205(a) provides:

The insured shall not be bound by any statement made in an application for a policy unless a copy of such application is attached to or endorsed on the policy when issued as a part thereof.

The parties dispute whether this section applies to the Policy in this case.

Section 40–2205(a) on its face applies only to statements made in the application, not supplemental written statements by the insured where the insurance contract does not contain a complete integration clause. See *Guardian Life Ins. Co. Of Am. v. Tillinghast,* 512 A.2d 855, 857 (R.I.1986) (interpreting identical statutory provision; statute does not preclude insurer's reliance on medical examiner's report not attached to copy of application submitted to insured). In addition, the statute does not address fraudulent statements by the insured in extrinsic documents to induce the insurer to issue a policy. See *Mixon v. Great So. Life Ins. Co.,* 2001 WL 987160, at *4 (Tenn.Ct.App. Aug.21, 2001) (under Tennessee statute, application is not admissible in evidence as part of contract if copy not attached to policy, but it may be admitted to prove that policy was procured by fraud); *Liberty Nat'l Life Ins. Co. v. Hale,* 285 Ala. 198, 230 So.2d 526, 527 (1969) (part of application not attached to policy is admissible as evidence of fraud); see also 2 Couch On Insurance 3d § 18:14 at 18–20 (1997) (some courts allow unattached application as evidence of fraud). But *cf. Farmers Auto. Ins. Ass'n v. Pursley,* 130 Ill.App.2d 980, 267 N.E.2d 734, 737 (1971) (under statute, nothing said in application not made part of policy could form basis for claim of fraud); *Baldwin v. Supreme Tribe Of Ben Hur,* 203 Iowa 198, 212 N.W. 562, 563 (Iowa 1927) (under statute which required insurer to attach "any application or representation," unattached application could not be used to establish fraud). Section 2205(a) simply does not preclude AVEMCO from rescinding the Policy based on its defense that Van's

statements/non-disclosures in the Disclosure Statement were fraudulent and induced AVEMCO to issue the Policy.

Section 40–2205(a) also does not preclude AVEMCO from relying on the Disclosure Statement as a basis for its rescission defense because the statute is not applicable to stop loss or excess loss insurance policies such ·as the one between AVEMCO and Van. Article 22 was originally passed in 1951 and applied only to "accident and sickness" policies. Since 1951, Article 22 has contained a provision which states:

> Nothing in this act shall apply to or affect: (1) *Any policy or contract of reinsurance;* (2) life insurance, endowment or annuity contracts, or contracts supplemental thereto which contain only such provisions relating to accident and sickness insurance as (a) provide additional benefits in case of death or dismemberment or loss of sight by accident, or as (b) operate to safeguard such contracts against lapse; or to give a special surrender value or special benefit or an annuity in the event that the insured or annuitant shall become totally and permanently disabled, as defined by the contract or supplemental contract; (3) fraternal benefit societies; or (4) endorsements or supplemental coverages, as authorized by K.S.A. 40–1110; (5) except as to K.S.A. 40–2209 and 40–2210, or any amendments thereto, any blanket or group policies of sickness and accident insurance; and (6) except as to K.S.A. 40–2211 and 40–2212, or any amendments thereto, any policy or workmen's compensation insurance or liability insurance with or without supplementary expense coverage therein.

K.S.A. § 40–2208.[8] Section 2208 seems to clearly exclude reinsurance policies from the requirements of Section 2205. Van, however, argues that an amendment which added a definition of "stop loss or excess loss" insurance in Article 22 in 1997 suggests that Section 2205 applies to such policies. For reasons stated below, the Court rejects Van's position.

1. K.S.A. § 2201 Was Not Amended To Extend To Stop Loss And Excess Loss Insurance Policies The Scope Of Every Section In Article 22

■ In 1993, the Kansas Insurance Commissioner (KIC) issued a bulletin pertaining to stop loss or excess loss policies held by employers with self-funded benefit plans under ERISA. See Kan. Ins. Bulletin 1993–12, Issues Regarding The "Insured" Status Of Certain Health Benefit Programs (May 25, 1993). The bulletin set forth criteria for a policy to qualify as a stop loss or excess loss policy. It further provided that if a policy did not satisfy the criteria as a stop loss or excess loss policy, the KIC would treat the policy as a "group health insurance policy" subject to state laws and regulations. The department was interested in self-funded single employer health benefit plans with low specifications (or attachment points) on stop loss coverage, and issued this bulletin, because "some of the[ ] purported self-funded arrangements [we]re being formed for the purpose of avoiding compliance with Kansas' recent health insurance reform legislation." Id.

American Trust Administrators (ATA) sought KIC approval of a stop loss insurance policy with a specification (or attachment point) of zero.[9] Based on Bulletin 1993–12, the KIC refused to approve the

---

**8.** In 1957, minor technical amendments were made to this provision.

**9.** The KIC recognized that such purported stop loss policies are essentially group health policies because the employer does not retain any risk (other than the risk of collecting from the insurer).

policy. ATA challenged the KIC decision in the District Court of Shawnee County, Kansas. ATA maintained that (1) ERISA preempted the KIC ability to regulate stop loss insurance; (2) the KIC did not have statutory authority to regulate stop loss insurance; and (3) the KIC regulation was arbitrary and capricious. See *Am. Trust Adm'rs, Inc. v. Sebelius*, 267 Kan. 480, 483, 981 P.2d 248, 251 (1999) (ATA I). The District Court of Shawnee County held that the KIC was not preempted from regulating stop loss insurance, but that the KIC lacked statutory authority to do so. See *id.*

On May 15, 1997, shortly after the district court decision, the Kansas legislature amended Section 40–2201 to read as follows:

(a) The term "policy of accident and sickness insurance" as used herein includes any policy or contract insuring against loss resulting from sickness or bodily injury or death by accident, or both, issued by a stock, or mutual company or association or any other insurer. *(b) The term "policy of stop loss or excess loss insurance coverage" means a policy, contract, endorsement, attachments, amendments or other modifications that insure against losses of the policyholder issued by a stock, or mutual company or association or any other insurer.*

(amendment in italics).

Based on the amendment, the KIC proceeded to regulate ATA's stop loss insurance. In response, ATA filed a new ad-

ministrative complaint and subsequent lawsuit in the District Court of Johnson County, Kansas.[10] ATA again argued that the KIC lacked statutory authority to regulate stop loss or excess loss insurance. The district court rejected ATA's argument and the Kansas Supreme Court affirmed. See *Am. Trust Adm'rs, Inc. v. Sebelius*, —— Kan. ——, 44 P.3d 1253 (2002) (ATA II). It ruled:

At the time of the amendment, the Shawnee District Court had ruled the Commissioner did not have authority under Kansas statutes to regulate stop-loss insurance. *It is logical to conclude the legislature amended 40–2201 in response to the Shawnee District Court order. Further, it is logical to conclude the purpose of the amendment was to give the authority to the Commissioner that the district court had said did not exist.* The session law in issue, L.1997, ch. 190, § 24, was also known as Senate Bill 204. The language in the session law containing the amendment to 40–2201 did not appear until after the Shawnee District Court's April 25, 1997, memorandum decision. For example, the form of the Senate Bill 204 as reported on March 24, 1998, only contained 15 sections but did not yet contain § 24. House J., 1997, pp. 539–40. The next time Senate Bill 204 appears in either the House or Senate Journals with the amendment affecting 40–2201 was the report of the conference committee on May 3, 1997. House J., 1997, pp. 958–68.

**10.** ATA also filed a contempt action in the District Court of Shawnee County, Kansas, contending that KIC's attempt to regulate stop loss insurance violated the court's previous rulings which held that the KIC lacked statutory authority to regulate stop loss insurance. The district court ruled that KIC was not in contempt because K.S.A. § 40–2201, as amended, granted her authority to regulate stop loss and excess loss insurance. The Kan-

sas Supreme Court affirmed. See *ATA I*, 267 Kan. at 480, 981 P.2d at 254. In ATA I, the Kansas Supreme Court held that the district court had not abused its discretion, but did not address the ultimate question presented in ATA's administrative complaint, i.e. whether Section 2201 actually empowers the KIC to regulate stop loss and excess loss insurance. See *id.* at 490, 981 P.2d at 254–55.

.... When a legislature revises an existing law, it is presumed that the legislature intended to change the law. *Board Of Sedgwick County Comm'rs v. Action Rent To Own, Inc.*, 266 Kan. 293, 304, 969 P.2d 844 (1998). However, this presumption may be weak according to the circumstances and may be wanting altogether. 266 Kan. at 304, 969 P.2d 844. "The presumption is fairly strong in the case of an isolated, independent amendment, but is of little force in the case of amendments adopted in a general revision or codification of the law." *Board Of Education Of U.S.D. 512 v. Vic Regnier Builders, Inc.*, 231 Kan. 731, 736, 648 P.2d 1143 (1982).

Assuming the presumption applies here, and there is no reason to believe it does not given *the amendment is "isolated and independent," the amendment is interpreted as granting the Commissioner authority to regulate stop-loss insurance.* Assuming the opposite conclusion, i.e. the legislature intended for the Commissioner not to have such authority, would render the amendment meaningless.

*ATA II*, 44 P.3d at 1258–59 (emphasis added).

Based on the Kansas Supreme Court's reasoning in ATA II, the isolated purpose of the 1997 amendment to Section 40–2201 was to grant the KIC authority to regulate stop loss and excess loss insurance. The Kansas Supreme Court did not mention any other purposes of the amendment—such as expanding the scope of Sections 40–2202 to 40–2207—and noted that the amendment was "isolated and indepen-

dent." *Id.* at 1259. In addition, the purpose of KIC Bulletin 1993–12 was to ensure that stop loss and excess loss policies with a very low specification (attachment point) were regulated and treated as "group health insurance" policies. Bulletin 1993–12. Nothing in the bulletin suggests that the KIC was attempting to subject purported stop loss and excess loss policies to the requirements of *individual* accident and sickness policies (Sections 40–2202 and 40–2207).

### 2. K.S.A. Sections 40–2202 to 40–2207 Apply Only To Accident And Sickness Policies

The phrase "accident and sickness" policies is defined in Section 40–2201, and the substantive provisions which pertain to individual accident and sickness policies are contained in Sections 40–2202 through 40–2207. See *Gibson v. Metro. Life Ins. Co.*, 213 Kan. 764, 768, 518 P.2d 422, 425 (1974) ("By their own terms K.S.A. 40–2202, 40–2203, 40–2204, 40–2205, 40–2206 and 40–2207, as amended, taken together, apply only to accident and sickness policies issued and delivered to individuals, as distinguished from other types of accident and sickness policies mentioned later in the same article."); see also § 40–2208 (except for requirements in Sections 2209 and 2210, group accident and sickness policies are excluded from Act). As noted above, Section 40–2201 was amended in 1997 to add a definition for policies of "stop loss or excess loss insurance coverage," but Article 22 was not otherwise amended at that time. Except for the definition in Section 40–2201, Article 22 does not refer to or attempt to regulate such policies.[11] On

---

**11.** One other provision of the Kansas Statutes enacted in 1991 refers to "reinsurance" or "stop-loss coverage." K.S.A. § 40–2222b(a) ("As a condition precedent to continuation of the exemption provided by K.S.A. 40–2222, and amendments thereto, each association described in subsections (a), (b), (c), (d) and (e) thereof shall, no later than May 1 of each year, pay a tax at the rate of 1% per annum upon the annual Kansas gross premium collected during the preceding calendar year. In the computation of the tax, such associations shall be entitled to deduct any annual Kansas gross premiums returned on account

their face, or implicitly, Sections 40–2202 through 40–2207 apply only to individual accident and sickness policies. These provisions cannot logically be extended to stop loss and excess loss insurance by virtue of the 1997 amendment to Section 40–2201. See, e.g., 40–2202(a) (requirements for issuance of "policy of accident and sickness insurance"); 40–2203(A)(10) (uniform provision that insurer may obtain physical examination of insured); 40–2203(B)(11) (uniform provision regarding losses caused by intoxication of insured); 40–2204(A) (policy shall not contain provisions which are less favorable than those in Section 40–2203); Gibson, 213 Kan. at 768, 518 P.2d at 425 (40–2202 though 40–2207 apply only to accident and sickness policies); 40–2207 (effect of misstatement of insured's age on policy with age limit).

Finally, the 1997 amendment does not purport to alter Section 40–2208, which states that "[n]othing in this act shall apply to or affect: (1) Any policy or contract of reinsurance." Van maintains that the Policy provides "stop loss or excess loss insurance," not "reinsurance." In support, Van argues that because Section 40–2208 already excluded "reinsurance," the Kansas Legislature would not have amended the statute to add a definition of "stop loss or excess loss" insurance policies unless such policies were not "reinsurance" policies. Van's argument does not address the question whether the Kansas Legislature intended that the substantive provisions of Sections 40–2202 to 40–2207 apply to policies other than individual accident and sickness policies. For reasons elsewhere stated in this order, the Court finds that the Kansas Legislature did not intend for

the 1997 amendment to Section 2201 to expand beyond individual accident and sickness policies the reach of Sections 40–2202 through 40–2207. Neither group health insurance policies, stop loss or excess loss policies, or reinsurance policies fall within the scope of these provisions. Accordingly, the 1997 amendment does not resolve the question whether a stop loss or excess loss policy is also a reinsurance policy for purposes of Section 2208.

Kansas law does not define the term "reinsurance," but it ordinarily is defined as:

> the ceding by one insurance company to another of all or a portion of its risks for a stipulated portion of the premium, in which the liability of the reinsurer is solely to the reinsured, which is the ceding company, and in which contract the ceding company retains all contact with the original insured, and handles all matters prior to and subsequent to loss.

13A John Alan Appleman & Jean Appleman, Insurance Law & Practice § 7681 at 480 (1976). Van essentially agrees with this definition of reinsurance but states that it does not apply because (1) Van is not an insurance company, and (2) the premium which it paid to AVEMCO had no relation to any premium it received from its dealerships and/or employees. As to Van's first argument, the Plan—rather than Van itself—purchases stop loss insurance. The Plan is a substitute for private group health insurance, and it acts as the health insurer of Van employees. Van considered enrolled employees to be insureds under the Plan.[12] As to Van's second argument, Van concedes that premiums paid into the Plan—which it set—

---

of cancellation or dividends returned to members or expenditures used for the purchase of *reinsurance or stop-loss coverage.*") (emphasis added). The limited statutory reference is insufficient to conclude that in the 1997 amendment to Section 40–2201, the Kansas Legislature intended to treat differently stop loss or excess loss policies and reinsurance policies.

12. Under ERISA, because the Plan is self-funded, it is not "deemed to be an insurance company ... or to be engaged in the business of insurance ... *for purposes of any law of any State purporting to regulate insurance companies, [or] insurance contracts.*" 29 U.S.C. § 1144(B)(2)(b) (emphasis added). Of course, this classification is only for purposes of determining whether various state laws ap-

were intended to cover the cost of reinsurance. See Defendant's Memorandum In Support Of Its Motion For Summary Judgment (Doc. # 36) filed June 21, 2002, Statement of Facts, ¶ 11 (uncontested). AVEMCO's quote for reinsurance was based in part on the number of Van employees. The premium which AVEMCO charged is in aggregate (not on a per employee basis), but it nevertheless is a "stipulated portion of the premium" that Van receives from its employees. 13A John Alan Appleman & Jean Appleman, Insurance Law & Practice § 7681 at 480 (1976).

Van cannot adequately distinguish "stop loss" policies and "reinsurance." The relationship between "stop loss" or "excess loss" policies and policies of "reinsurance"

is so intertwined that the Kansas Legislature certainly would have specified any intent to distinguish such policies. Van concedes that the term "reinsurance," as used in the insurance industry, "is a term-of-art that is often used to refer to policies of stop loss or excess loss insurance coverage." Memorandum In Support Of Plaintiff's Motion For Summary Judgment (Doc. # 38) filed June 21, 2002 at 13. Indeed, on numerous occasions, Van and Gallagher referred to the Policy in this case as one for "reinsurance." See Defendant's Memorandum In Support Of Its Motion For Summary Judgment (Doc. # 36) filed June 21, 2002, Statement of Facts, ¶ 20 (uncontested). Courts, state legislatures and commentators generally treat stop loss or excess loss policies as ones for reinsurance.[13]

---

ply and does not prohibit a Plan from otherwise carrying on the normal activities of an insurer including the purchase of reinsurance.

**13.** Some courts use the terms "reinsurance" and "stop loss" coverage interchangeably, see, e.g., *United States v. Mangiardi*, 201 F.Supp.2d 386, 387 (M.D.Pa.2002); *In re Physician Corp. Of Am. Secs. Litig.*, 50 F.Supp.2d 1304, 1307 n. 4 (S.D.Fla.1999); some refer to "stop loss" insurance as a form of "reinsurance," see, e.g., *Am. Med. Sec., Inc. v. Larsen*, 31 F.Supp.2d 502, 503 (D.Md.1998); *Andrews–Clarke v. Travelers Ins. Co.*, 984 F.Supp. 49, 61 n. 68 (D.Mass.1997); some refer to "stop loss" insurance as akin to "reinsurance," see, e.g., *Am. Med. Sec., Inc. v. Bartlett*, 111 F.3d 358, 361 (4th Cir.1997), cert. denied, 524 U.S. 936, 118 S.Ct. 2340, 141 L.Ed.2d 711 (1998); *Travelers Ins. Co. v. Cuomo*, 14 F.3d 708, 723 (2d Cir.1993), rev'd on other grounds, 514 U.S. 645, 115 S.Ct. 1671, 131 L.Ed.2d 695 (1995); and finally others simply refer to a single policy as one for "stop loss reinsurance," see, e.g., *Camp v. Pac. Fin. Group*, 956 F.Supp. 1541, 1547 (C.D.Cal. 1997); *Leonhardt v. Holden Bus. Forms Co.*, 828 F.Supp. 657, 660 (D.Minn.1993). Courts also refer to certain excess loss policies as reinsurance. See *In re Physician Corp.*, 50 F.Supp.2d at 1307 n. 4; *Russell County Sch. Bd. v. Conseco Life Ins. Co.*, No.

1:01CV00131, 2001 WL 1593233, at *1 (W.D.Va. Dec.12, 2001); *Norcraft Cos., LLC v. Ahrens Fin. Sys. Inc.*, No. 00–1284–JTM., 2000 WL 1375269, at *1–2 (D.Kan. Sept.15, 2000).

State legislatures generally classify "stop loss or excess loss" policies as forms of reinsurance. See, e.g., Ark.Code Ann. § 23–79–509 (refers to "stop-loss or excess-of-loss insurance" or "other arrangements for reinsurance coverage"); Ill. Comp. Stat. Ch. 215 § 105/7 (same); Haw.Rev.Stat. § 431:3A–402 (referring to reinsurance, stop loss, or excess loss insurance in same category); Mich. Comp. Laws § 500.537 (same); Neb.Rev.Stat. § 44–914(1)(d) (same); Idaho Code § 41–5501(3) (reinsurance includes excess or stop loss coverage). But cf. La.Rev.Stat. § 22:675 ("Stop-loss or excess insurance shall not be equivalent to reinsurance, as reinsurance only relates to transactions between insurers."). Commentators likewise have classified stop loss and excess loss policies as forms of reinsurance. See, e.g., 1 Couch On Insurance 3d, § 9:22 n. 39 (2002) ("Stop-loss insurance policies can be defined as insurance policies which insure employee benefit plans for excess or catastrophic loss over specified aggregate amounts under terms of policy. Stop-loss insurance is form of reinsurance for self-insured plans."); Graydon S. Staring, Law of Reinsurance, § 2:8 (1993) (including "excess of loss" and "stop loss" as forms of reinsur-

Based on the statutory language of Article 22, the Court concludes that Section 40–2205 does not apply to policies for stop loss or excess loss insurance such as the one between Van and AVEMCO. Accordingly, the Court overrules Van's motion for summary judgment as to its argument that AVEMCO cannot rely on fraudulent misrepresentations in documents outside the insurance contract as a basis to rescind the Policy.

### C. Whether AVEMCO Waived Its Right To Rely On The Disclosure Statement?

 Van argues that AVEMCO has waived its right to rely on the Disclosure Statement. Waiver implies that a party has voluntarily and intentionally renounced or given up a known right, or has caused or done some positive act or positive inaction which is inconsistent with the contractual right. See *Schraft v. Leis,* 236 Kan. 28, 36, 686 P.2d 865, 873 (1984). "Waiver is consensual in nature but the intention may be inferred from conduct and the knowledge may be actual or constructive." *Id.*

Van first contends that AVEMCO waived its right to rely on the Disclosure Statement because AVEMCO issued the Policy without requiring plaintiff to answer Question 11 on the Application and AVEMCO did not attach the Disclosure Statement to the Application. Based on the circumstances surrounding the execution of the Disclosure Statement, a reasonable jury could find that by issuing the Policy, AVEMCO did not voluntarily and intentionally give up its right to rely on the Disclosure Statement. In addition, as explained above, AVEMCO was not required by statute or otherwise to attach the Disclosure Statement to the Application. See supra text, part I.B. Accordingly, a reasonable jury could find that AVEMCO's failure to attach the Disclosure Statement to the Application did not constitute a waiver of its right to rely on the document.

Next, Van argues that AVEMCO waived its right to rely on the Disclosure Statement because it knew of Megan's diagnosis when it issued the Policy on May 12, 2000. Van assumes that Gallagher mailed HCCB a LCN form for Megan's illness in January of 2000. AVEMCO has presented sufficient evidence, however, to raise an issue of material fact whether Gallagher actually sent the LCN form at that time. In particular, Thanos, an excess consultant for Gallagher, testified that Gallagher does not send LCNs to insurance carriers if a claim is not covered. On January 17, 2000, when Swanberg purportedly mailed the LCN form to HCCB, Van had not yet made a coverage decision on Megan's claim. Moreover, Gallagher employees have made inconsistent statements whether the LCN was mailed and whether the form was mailed to HCCB or MGU.

Finally, Van argues that AVEMCO waived its right to rely on the Disclosure Statement because it knew of Megan's diagnosis when it accepted the Plan Document on August 7, 2000. Van assumes that the contract of insurance was not complete until August 7, 2000 and that AVEMCO could have withdrawn its agreement to issue the Policy until that date. Even if AVEMCO had the right to refuse to issue the Policy before it approved the Plan Document, AVEMCO notified Van on June 1, 2000, that it might deny the claim for Megan because Van had not disclosed her during the underwriting process. Accordingly, AVEMCO's acceptance of the final contract document (the Plan Document) on August 7, 2000, by itself, is insufficient to establish as a matter of law that

ance); Barry R. Ostrager & Thomas R. Newman, 2 Handbook On Insurance Coverage Disputes, § 15.02[b], at 919–20 (11th ed.2002) (same).

AVEMCO waived its right to rescind the Policy based on Van's failure to disclose Megan during the underwriting process. See *Schraft*, 236 Kan. at 36, 686 P.2d at 873.

For these reasons, Van's motion for summary judgment is overruled. As a matter of law, the Disclosure Statement is not part of the parties' insurance contract and does not constitute a separate contract. AVEMCO, however, may rely on Van's representations in the Disclosure Statement as a basis for its rescission (fraudulent inducement) defense. In addition, genuine issues of material fact exist whether AVEMCO waived its right to rely on the Disclosure Statement because (1) it did not require Van to fully complete the Application, (2) it did not attach the Disclosure Statement to the Application or Policy, (3) it knew of Megan's diagnosis when it issued the Policy on May 12, 2000, and (4) it knew of Megan's diagnosis when it accepted the Plan Document on August 7, 2000.

## II. AVEMCO's Motion For Summary Judgment (Doc. # 35)

AVEMCO argues that Van cannot recover under the insurance policy because AVEMCO rescinded the policy after it discovered that in the Disclosure Statement, plaintiff did not disclose Megan as a known shock loss, a potential shock loss or a disabled life. In Kansas, to rescind an insurance contract based on a fraudulent misrepresentation, the insurer must show by clear and convincing evidence: (1) an untrue statement of fact by the insured, (2) that the insured knew the statement was untrue, (3) the insured made the statement with the intent to deceive or recklessly with disregard for the truth, and (4) the insurer justifiably relied on the statement and acts to its injury and detriment.[14] See *Waxse v. Reserve Life Ins. Co.*, 248 Kan. 582, 586, 809 P.2d 533, 536 (Kan.1991).

AVEMCO maintains that to rescind an insurance contract, the insurer need not establish that the insured made a statement or non-disclosure "with the intent to deceive or recklessly with disregard for the truth." In the pretrial order, however, defendant specifically included this language as an element of its affirmative defense. See Pretrial Order (Doc. # 34) filed May 22, 2002 at 20 (element 3: "Such non-disclosure by plaintiff and its agents was made with the intent to deceive or recklessly made with disregard for the truth"). Moreover, AVEMCO has not cited a Kansas case which supports the proposition that an insurance policy may be rescinded based on a negligent misrepresentation. Several states have adopted such a rule, see, e.g., *Munroe v. Great Am. Ins. Co.*, 234 Conn. 182, 661 A.2d 581, 584 n. 4 (1995); *John Hancock Mut. Life Ins. Co. v. Weisman*, 27 F.3d 500, 504 (10th Cir. 1994) (New Mexico law); *Curtis v. Am. Cmty. Mut. Ins. Co.*, 610 N.E.2d 871, 874 (Ind.Ct.App.1993), but the Kansas Supreme Court cases which address the issue of rescission based on fraud strongly suggest that Kansas does not and would not allow an insurance policy to be rescinded based on mere negligence.

---

**14.** Courts have applied these elements for alleged fraudulent statements or non-disclosures in the insurance application itself, see *Waxse*, supra, but the Court sees no reason why the same elements should not apply to statements in supplemental disclosures which are not part of the insurance application or contract. See, e.g., *Nordstrom v. Miller*, 227 Kan. 59, 65, 605 P.2d 545, 551–52 (1980) ("Actionable fraud includes an untrue statement of fact, known to be untrue by the party making it, made with the intent to deceive or recklessly made with disregard for the truth, where another party justifiably relies on the statement and acts to his injury and damage.").

In Waxse, the trial court concluded that the insured made a fraudulent misrepresentation on an application of insurance and granted the insurer's motion for summary judgment. See 248 Kan. at 583, 809 P.2d at 535. The Kansas Supreme Court reversed. It held that the insured's answers on the application were in fact true and that the insured's failure to disclose a previous HIV-positive test result was in "good faith." See *id.* at 587–88, 809 P.2d at 537. In *American States Ins. Co. v. Ehrlich,* 237 Kan. 449, 701 P.2d 676 (1985), the Kansas Supreme Court noted that to sustain an action to rescind an insurance contract based on fraudulent misrepresentation, the insurer must show that the insured acted "with the intent to deceive or recklessly [ ] with disregard for the truth." *Id.* at 452, 701 P.2d at 678. The Kansas Supreme Court noted:

> A fraudulent "misrepresentation" in the law of insurance is a statement by the insured as a fact of something which is untrue, and which the insured states with the knowledge that it is untrue and *with an intent to deceive, or which he states positively as true without knowing it to be true,* and which has a tendency to mislead, where such fact in either case is material to the risk.

*Id.* at 452, 701 P.2d at 679 (citation omitted) (emphasis added). Finally, in *Scott v. Nat'l Reserve Life Ins. Co.,* 143 Kan. 678, 56 P.2d 76, 77 (1936), modified on other grounds, 144 Kan. 224, 58 P.2d 1131 (1936), the Kansas Supreme Court specifically rejected the theory that an insurer may rescind a policy based on a negligent misrepresentation or omission. It stated:

> Before considering the facts and testimony in the case, we may briefly refer to the legal distinctions that are discussed in the briefs as between fraud and misrepresentations. *A mere misstatement of the actual truth unintentionally made and in good faith may not amount to fraud.* It was said in *Mutual Life Ins. Co. v. Wiswell,* 56 Kan. 765, 44 P. 996, 35 L.R.A. 258, that *a mere misstatement, unless willful and fraudulent, will not avoid the policy, in the absence of a warranty of the truth of the statement.* The following statement from 14 R.C.L. 1021 is helpful in making a proper discrimination: "A misrepresentation in insurance is a statement of something as a fact which is untrue, and which the assured states, knowing it to be untrue, *with an intent to deceive, or which he states positively as true, without knowing it to be true,* and which has a tendency to mislead, such fact in either case being material to the risk."

*Scott,* 143 Kan. 678, 56 P.2d at 77 (emphasis added).

Based on the Kansas Supreme Court decisions in Waxse, American States and Scott, the Court rejects AVEMCO's argument that it may rescind the Policy based on a negligent misrepresentation or omission in the Disclosure Statement.[15] In its reply brief, AVEMCO argues that even if fraudulent intent is necessary, it has shown such intent as a matter of law. The Court disagrees. Viewing the evidence in a light most favorable to Van, Van informed HCCB of Megan's diagnosis at or near the time it executed the Disclosure Statement, on a LCN form which was one way to notify HCCB of shock losses. Based on the entire record, a reasonable jury could conclude that Van and Gallagher did not act with intent to deceive or recklessly with disregard for the truth

---

**15.** Of course, if the Disclosure Statement had been included in the parties' contract of insurance, AVEMCO may have had a contractual right to rescind the Policy based on a negligent misrepresentation or omission. See Policy, Section 6 (if information in contract documents has been materially misrepresented, AVEMCO has right to rescind policy).

and/or that AVEMCO knew of Megan's diagnosis before it issued the Policy in May of 2000. Indeed, AVEMCO concedes that "[i]t is possible that plaintiff's misrepresentation [ ] in the Disclosure Statement was merely negligent." Defendants' Reply To Plaintiff's Response To Defendant's Summary Judgment Motion (Doc. # 41) filed July 23, 2002 at 12. The Court therefore overrules defendant's motion for summary judgment.

**IT IS THEREFORE ORDERED** that Defendant AVEMCO's Motion For Summary Judgment (Doc. # 35) filed June 21, 2002 be and hereby is **OVERRULED.**

**IT IS FURTHER ORDERED** that Plaintiff's Motion For Summary Judgment (Doc. # 37) filed June 21, 2002, be and hereby is **OVERRULED.**